No. 111,698

STATE OF KANSAS, *Appellant*, v. DAVID LEE RYCE, *Appellee*.

(368 P.3d 342)

900

Opinion filed February 26, 2016.

*Lesley A. Isherwood,* assistant district attorney, argued the cause, and *Marc Bennett,* district attorney, and *Derek Schmidt,* attorney general, were with her on the brief for appellant.

*Patrick H. Dunn,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights protect against unreasonable searches, which in the criminal context means a search must be conducted pursuant to a warrant or a well-recognized exception to the warrant requirement. One of these well-recognized exceptions—the consent exception—arises when an individual voluntarily agrees to allow a search. Courts have generally recognized a search based on consent cannot proceed once a suspect's consent is withdrawn because, at that point, the search would no longer be voluntary. See *State v. Johnson*, 297 Kan. 210, Syl. ¶ 8, 301 P.3d 287 (2013); *State v. Edgar*, 296 Kan. 513, 527, 294 P.3d 251 (2013).

Premised on this consent exception, Kansas has established a mechanism for the warrantless search of a driving under the influence (DUI) suspect's blood, breath, urine, or other bodily substances to determine the alcohol content. Specifically, under K.S.A. 2014 Supp. 8-1001, an individual has, by operating or attempting to operate a vehicle in Kansas, provided implied consent to alcohol or drug testing. This appeal raises a threshold question of whether the general rule regarding the withdrawal of consent applies when a driver impliedly consents to testing under 8-1001(a) in exchange for driving privileges but then refuses to expressly consent to testing when requested by a law enforcement officer. In other words, is implied consent irrevocable?

We hold the general rule allowing an express withdrawal of consent applies to DUI testing under 8-1001: Once a suspect withdraws consent, whether it be express consent or implied under 8-1001(a), a search based on that consent cannot proceed. But this is only a preliminary question in this appeal. The ultimate question is whether, when a driver exercises the constitutional right to withdraw consent, Kansas may criminally punish the individual for this choice under the criminal refusal statute, K.S.A. 2014 Supp. 8-1025. We conclude it cannot. Applying the Due Process Clause of the Fourteenth Amendment to the United States Constitution, we recognize Kansas has compelling interests in combating drunk

driving and prosecuting DUI offenders. Nevertheless, by criminally punishing a driver's withdrawal of consent, 8-1025 infringes on fundamental rights arising under the Fourth Amendment. K.S.A. 2014 Supp. 8-1025, therefore, must withstand strict scrutiny by being narrowly tailored to serve the State's interests. We hold that K.S.A. 2014 Supp. 8-1025 does not meet this test and is facially unconstitutional.

## FACTS AND PROCEDURAL HISTORY

On December 9, 2012, a Sedgwick County sheriff's deputy observed a man, later identified as David Lee Ryce, driving a car down a street in reverse. The deputy momentarily lost sight of Ryce but then saw Ryce pull out of a nearby parking lot and drive on the left side of the street. The deputy executed a traffic stop and, upon making contact with Ryce, noticed a strong odor of alcohol and Ryce's bloodshot and watery eyes. Ryce admitted to the deputy he had enjoyed "a few drinks," and the deputy noted Ryce's slow, lethargic, and slurred speech. Ryce told the deputy he did not have his driver's license.

The deputy administered field sobriety tests. Ryce complied but demonstrated impairment throughout the tests. The deputy also learned Ryce's car registration did not match its tag and that Ryce's driver's license was suspended. The deputy arrested Ryce and transported him to the county jail.

At the jail, the deputy gave Ryce the written and oral notice required under Kansas' implied consent law, specifically the notice defined in K.S.A. 2014 Supp. 8-1001(k), and asked Ryce to submit to a breath test to determine the presence of alcohol. The notice informed Ryce, among other things, that a refusal to submit to testing could result in administrative proceedings to suspend Ryce's driver's license and could also result in criminal charges. Despite these warnings, Ryce refused to submit to a breath test, and no testing occurred.

The State charged Ryce, who had four prior DUI convictions, with the nonperson felony of refusing to submit to testing for the presence of alcohol or drugs, in violation of 8-1025(a). In addition, the State charged Ryce with three misdemeanors: driving while suspended, driving without a tag, and improper backing.

Ryce moved to dismiss the test refusal charge on the grounds that 8-1025 unconstitutionally punished the exercise of his right to withdraw consent to a warrantless search—a right he argues arises under the Fourth Amendment and § 15 of the Kansas Constitution Bill of Rights. He also cited the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The district court ruled, after a hearing, that while a defendant had no right to refuse to submit to a chemical test for alcohol, it was nonetheless unconstitutional to criminalize this refusal. The district court accordingly dismissed the 8-1025 charge and granted the State's motion to dismiss the remaining counts without prejudice.

The State appealed the district court's ruling, filing its appeal with this court under K.S.A. 2014 Supp. 22-3601(b)(1) and K.S.A. 2014 Supp. 22-3602(b)(1) (permitting an appeal directly to this court from the district court for cases in which a Kansas statute has been held unconstitutional). We conducted oral argument in Ryce's appeal on the same day we heard three other appeals relating to the constitutionality of 8-1025: *State v. Wilson*, 303 Kan. 973, 368 P.3d 1086 (2016), *State v. Nece*, 303 Kan. 888, 367 P.3d 1260 (2016), and *State v. Wycoff*, 303 Kan. 885, 367 P.3d 1258 (2016), all of which are being decided this day.

## ANALYSIS

On appeal, the State argues it did not violate Ryce's Fourth Amendment rights because the implied consent procedures set out in chapter 8, article 10 of the Kansas Statutes Annotated—primarily those in K.S.A. 2014 Supp. 8-1001—remove, or at least reduce, any privacy expectation in one's blood, breath, urine, or other bodily substances when circumstances exist that permit testing under the statute. The State also argues this court has repeatedly determined that the implied consent procedure creates a constitutionally valid alternative to a search warrant under either the Fourth Amendment or § 15 of the Kansas Constitution Bill of Rights. Because 8-1001 provides that every driver has given implied consent, and because consent constitutes a valid warrant exception, the State reasons that 8-1025 merely punishes a driver for not cooperating with a test the driver already consented to by driving on Kansas roads in a way that established probable cause to suspect the driver

of a DUI offense. In essence, according to the State, 8-1025 merely punishes a driver for obstructing a law enforcement officer in the exercise of official duty. The State argues it may also constitutionally punish a DUI suspect who does not submit to testing because, in addition to the consent exception, the search could be justified under several other well-delineated exceptions to the Fourth Amendment's warrant requirement. Succinctly put, the State argues Ryce had no constitutional right to refuse to submit to the test.

In reply, Ryce asserts 8-1025 is facially unconstitutional, meaning unconstitutional in all circumstances and not just in how it was applied to him. He reasserts the Fourth and Fourteenth Amendment arguments he made before the district court. In addition, for the first time on appeal, he argues that 8-1025: (1) violates his right to be protected from self-incrimination under the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights and (2) implicates the doctrine of unconstitutional conditions.

We focus our analysis on the original argument Ryce made in the district court—specifically, whether 8-1025 facially violates the Fourth and Fourteenth Amendments. In addressing this argument, we structure our analysis with the following elemental questions: (1) What does the language of 8-1025 and the statute it incorporates, 8-1001, provide? (2) Does the Fourth Amendment apply to the tests contemplated by 8-1025 and 8-1001 and, if so, what are the overarching Fourth Amendment principles that guide our analysis? (3) What is the test to be applied to Ryce's facial challenge of 8-1025? (4) How do past cases upholding nonconsensual searches impact our analysis? (5) Does statutory consent in Kansas provide irrevocable consent? and (6) If a person has the right to withdraw consent, do the United States and Kansas Constitutions prevent the State from criminally punishing a person for doing so?

By answering these elemental questions, we can resolve the ultimate issue Ryce presented to the district court regarding the facial constitutionality of 8-1025. This ultimate issue presents a question of law subject to unlimited review. *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014).

Our unlimited review of this question of law is subject to the rules of statutory interpretation. In this case, we must interpret two statutes. First, because Ryce challenges 8-1025, we must apply and interpret it. Second, because 8-1025 references and essentially stands on the shoulders of the implied consent provision, we must apply and interpret 8-1001. In interpreting both statutes, we ascertain legislative intent by looking to these statutes' plain language, giving common words their ordinary meaning. If the plain language is unambiguous, we, like all Kansas courts, ordinarily do "not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it.' *Cady v. Schroll*, 298 Kan. 731, 738-39, 317 P.3d 90 (2014)." *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 998-99, 348 P.3d 602 (2015).

In addition, we presume 8-1025's constitutionality and resolve any doubts in favor of its validity. "[I]f there is any reasonable construction [of 8-1025] that will maintain the legislature's apparent intent" and render the statute constitutional, we will adopt it. *Soto*, 299 Kan. at 121 (citing *State v. Gaona*, 293 Kan. 930, 935, 270 P.3d 1165 [2012]); see *Clark v. Martinez*, 543 U.S. 371, 381, 125 S. Ct. 716, 160 L. Ed. 2d 734 (2005) (principle of constitutional avoidance is "tool for choosing between competing plausible interpretations of a statutory text" to avoid decision of constitutional questions).

With these rules of statutory interpretation in mind, we begin our analysis with the statutory language of K.S.A. 2014 Supp. 8-1025 and K.S.A. 2014 Supp. 8-1001.

1. *What does the language of 8-1025 and 8-1001 provide?*

The legislature concisely worded the prohibitory language in K.S.A. 2014 Supp. 8-1025. The crime of test refusal is specific, occurring when a person refuses "to submit to or complete a test or tests *deemed consented to* under subsection (a) of K.S.A. 8-1001." (Emphasis added.) This criminal refusal statute only applies if the DUI suspect has previously refused DUI testing under 8-1001 or has been previously convicted of a DUI offense. Upon conviction under 8-1025, graduated penalties apply. A first or second offense is a nonperson misdemeanor and requires imprisonment for at

least 48 hours followed by probation or additional jail time. K.S.A. 2014 Supp. 8-1025(b)(1)(A). Third and subsequent offenses are classified as nonperson felonies, and a conviction results in mandatory imprisonment. K.S.A. 2014 Supp. 8-1025(b)(1)(D). These penalties are equal to or greater than the penalties imposed for a DUI conviction. K.S.A. 2014 Supp. 8-1001(k)(4).

The phrase "deemed consented to" in 8-1025 echoes the language of the referenced provision, 8-1001(a). That provision provides, in part:

"Any person who operates or attempts to operate a vehicle within this state *is deemed to have given consent*, subject to the provisions of this article [10 of chapter 8 of the Kansas statutes], to submit to one or more tests of the person's blood, breath, urine or other bodily substance to determine the presence of alcohol or drugs." (Emphasis added.) K.S.A. 2014 Supp. 8-1001(a).

"Deemed" consent, as used in 8-1025 and 8-1001, equates to the "implied" consent to testing given by a person who operates or attempts to operate a vehicle in Kansas—someone we will simply refer to as a "driver." See *Johnson*, 297 Kan. at 222.

These provisions seem straightforward enough—8-1025 penalizes drivers who refuse to submit to a test that they have impliedly consented to under 8-1001. But the statutory scheme quickly becomes more complex—as stated in 8-1001, a driver is deemed to have given consent to submit to testing "subject to the provisions" of article 10 of chapter 8 of the Kansas statutes. These provisions limit the circumstances under which "[a] law enforcement officer shall request a person to submit to a test or tests deemed consented to under subsection (a)." K.S.A. 2014 Supp. 8-1001(b). Among the restrictions, 8-1001(k) requires an officer to give a driver a written and oral advisory before testing. The notice must include, among other things, an explanation that the driver will face certain consequences if he or she refuses to submit to the testing, including the potential loss of driving privileges, the admission of the refusal into evidence, and criminal charges.

The statute contemplates two responses once a law enforcement officer has read the advisory. First, the driver can submit to the testing. Our caselaw has explained that a test taken after the driver receives the advisory required by 8-1001(k) "is the product of

the consent exception to the warrant requirement." *Johnson*, 297 Kan. 210, Syl. ¶ 8. In other words, agreeing to submit to testing reaffirms the implied consent and conveys actual, express consent. Second, the driver can do as Ryce did and refuse to submit to the testing and face potential civil and criminal consequences. We have equated an express refusal with a withdrawal of implied consent. *E.g.*, *State v. Garner*, 227 Kan. 566, 572, 608 P.2d 1321 (1980).

If a driver refuses to submit to testing, thereby withdrawing any implied consent, 8-1001 envisions two outcomes. In some instances, no testing will occur. Even without testing, a refusal carries consequences because evidence of the driver's refusal is admissible at a DUI trial, administrative proceedings may result in a revocation of the suspect's driver's license, and the State may file a criminal complaint charging the suspect with a crime under 8-1025. K.S.A. 2014 Supp. 8-1001(k)(4), (k)(5), (k)(7); K.S.A. 2014 Supp. 8-1002(c). In other instances, 8-1001 permits testing over a driver's express refusal. Compelled testing can occur if the driver committed a traffic offense and was involved in an accident or collision resulting in serious injury or death. K.S.A. 2014 Supp. 8-1001(b)(2), (d); but see *State v. Declerck*, 49 Kan. App. 2d 908, 317 P.3d 794, *rev. denied*, 299 Kan. 1271 (2014) (holding 8-1001[b][2], [d] unconstitutional to the extent it allows a search after a traffic infraction combined with an accident resulting in injury or death, if there is no probable cause that drugs or alcohol were involved).

In addition, the statute permits testing in one instance where the driver neither expressly consents nor expressly refuses. That circumstance is limited to situations where the driver: (1) is "medically unable to consent," (2) has committed a traffic offense, and (3) was involved in a serious injury or fatal accident. K.S.A. 2014 Supp. 8-1001(b)(2), (d), (h); but see *State v. Dawes*, No. 111,310, 2015 WL 5036690 (Kan. App. 2015) (unpublished opinion) (holding K.S.A. 2012 Supp. 8-1001[a] and [b][2] unconstitutional as applied to unconscious drivers).

We are not concerned in this appeal with compelled testing for drivers who are medically unable to consent or for drivers who otherwise are tested without their express consent. Rather, we must judge the facial constitutionality of 8-1025 and its punishment for

refusal to submit to testing—that is, the driver's *express withdrawal of consent*—in light of Ryce's argument that he was exercising a constitutional right under the Fourth Amendment by revoking his consent. Because Ryce's claim rests on the Fourth Amendment, as a threshold matter we must consider whether the Fourth Amendment applies and, if so, what overarching principles control our analysis.

2. *Does the Fourth Amendment apply and, if so, what are the overarching Fourth Amendment principles that guide our analysis?*

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966); see also *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251, 11 S. Ct. 1000, 35 L. Ed. 734 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.").

The Fourth Amendment's right to privacy, and thus the rule against unreasonable searches and seizures, is enforceable against the states and must be upheld by federal and state courts alike. See, *e.g.*, *Mapp v. Ohio*, 367 U.S. 643, 65053, 655-67, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (reaffirming that the Due Process Clause of the Fourteenth Amendment incorporates Fourth Amendment rights, including the rule excluding evidence that was obtained through an unreasonable search or seizure). Additionally, § 15 of the Kansas Constitution Bill of Rights is nearly identical to the Fourth Amendment and offers the same protections. *State v. Williams*, 297 Kan. 370, 376, 300 P.3d 1072 (2013). Thus, while we focus our analysis on the Fourth Amendment, the same applies to § 15.

### 2.1. *Does the Fourth Amendment apply?*

Preliminarily, the State argues we should not consider Ryce's Fourth Amendment arguments because the breath test requested by the officer would not have breached the type of privacy protected by the Constitution and, therefore, would not be considered a search within the meaning of the Fourth Amendment. The State acknowledges that past decisions have recognized breath tests are indeed searches under the Fourth Amendment but argues these cases fail to consider that every driver in Kansas agrees to the search because of operation of 8-1001(a). In other words, the State contends that blanket implied consent, which every driver gives in exchange for the privilege of operating or attempting to operate a vehicle in Kansas, eviscerates any expectation of privacy in one's bodily substances and fluids. The State secondarily argues this reduced privacy expectation weighs in its favor when the reasonableness of the search is evaluated.

Certainly, Fourth Amendment protections from governmental searches or seizures are limited to "expectation[s] of privacy that society is prepared to consider reasonable." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). Applying that standard, the United States Supreme Court has provided us an answer to the arguments posed by the State—which is that, regardless of implied consent laws, individuals have an expectation of privacy in bodily substances and fluids, and a breath test remains a search under the Fourth Amendment.

Most recently, in *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552, 1558, 185 L. Ed. 2nd 696 (2013) (quoting *Winston v. Lee*, 470 U.S. 753, 760, 105 S. Ct. 1611, 84 L. Ed. 2d 662 [1985]), the Supreme Court held that the "invasion of bodily integrity" necessary to conduct a blood test for the purpose of collecting evidence of intoxication "implicates an individual's 'most personal and deep-rooted expectations of privacy'" and is most certainly a "search" within the meaning of the Fourth Amendment. At the same time, the Court recognized that "all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC [blood alcohol content] testing if they are arrested or otherwise detained on suspicion of

a drunk-driving offense." 569 U.S. at ___, 133 S. Ct. at 1566. Yet the Court still firmly held a Fourth Amendment privacy interest arose; contrary to the State's argument, these drivers had a Fourth Amendment privacy interest in their bodily integrity. Although speaking of a blood test, the *McNeely* Court approvingly cited its prior opinion in *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 616-17, 626, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989), which discussed other types of BAC tests.

In *Skinner*, the Supreme Court initially had concluded that a blood test, with its "physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable." 489 U.S. at 616 (citing *Schmerber*, 384 U.S. at 767-68). Turning to breath tests, like the one Ryce refused to take, the Court had stated:

"Much the same is true of the breath-testing procedures required under Subpart D of the regulations. Subjecting a person to a breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis [citations omitted] implicates similar concerns about bodily integrity and, like the blood-alcohol test we considered in *Schmerber*, should also be deemed a search." *Skinner*, 489 U.S. at 616-17.

Finally, the *Skinner* Court had noted that urine tests "can reveal a host of private medical facts" and "may in some cases involve visual or aural monitoring of the act of urination." Given those circumstances, " '[t]here are few activities in our society more personal or private than the passing of urine.' " 489 U.S. at 617 (quoting *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 [5th Cir. 1987]).

By citing *Skinner*, the *McNeely* court acknowledged this analysis. Nevertheless, in *McNeely*, after citing *Skinner*, the Supreme Court observed that it had also stated "that people are 'accorded less privacy in . . . automobiles because of th[e] compelling governmental need for regulation,' *California v. Carney*, 471 U.S. 386, 392, 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985)." *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1565. Despite reduced privacy expectations and abundant regulation of automobiles, the Court observed that it had "never retreated . . . from our recognition that any compelled intrusion into the human body implicates significant,

constitutionally protected privacy interests.» 569 U.S. at ___, 133 S. Ct. at 1565.

Likewise, this court has repeatedly held that the tests authorized by 8-1001 constitute searches subject to Fourth Amendment protections. For example, *State v. Murry*, 271 Kan. 223, 226, 21 P.3d 528 (2001), states: *"Despite statutory language [in 8-1001] authorizing the taking of the blood sample*, any such bodily invasion must still be constitutionally sound. The Fourth Amendment is implicated when blood samples are drawn from the body." (Emphasis added.) The same rule applies to the type of breath test at issue in this case. See *State v. Jones*, 279 Kan. 71, 76, 106 P.3d 1 (2005) (discussing K.S.A. 8-1012 and holding that extracting deep lung breath for chemical analysis is a search subject to the strictures of the Fourth Amendment).

Consequently, we reject the State's argument that a breath test would not have been a search: The implied consent provision of 8-1001 does not mean Ryce, by taking the wheel of a vehicle after drinking, lost his reasonable expectation of privacy in his bodily integrity. Nor, as our discussion of *McNeely* illustrates, do we find a general reduced privacy expectation because Kansas adopted an implied consent law. In other words, the Fourth Amendment provides constitutional protections for Ryce's "'most personal and deep-rooted expectations of privacy'" that attach to alcohol testing procedures. *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1558 (quoting *Winston*, 470 U.S. at 760). Despite the implied consent in 8-1001, a breath, blood, or urine test is still a search.

That said, we still have a lingering Fourth Amendment concern: The text of the Fourth Amendment protects us from "searches and seizures," but Ryce does not complain of his seizure and no search occurred after Ryce refused to submit to testing. Ultimately, this case turns on the classification of the action punished by 8-1025—whether 8-1025 punishes a constitutionally protected act, as Ryce argues, or an unprotected act, as the State argues. As a result, and as we will more fully discuss, we base our ultimate conclusion regarding the constitutionality of 8-1025 on a violation of the Due Process Clause of the Fourteenth Amendment and its protection

of fundamental rights (like Fourth Amendment rights) against governmental interference. See *County of Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998).

Nevertheless, because Ryce claims the Fourth Amendment as the source for the fundamental right protected by the Due Process Clause, even though no search occurred, we start with the Fourth Amendment. We must consider whether the Fourth Amendment permitted the State to declare that Ryce could not legally withdraw his implied consent.

### 2.2. *What overarching Fourth Amendment principles guide our analysis?*

"[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner*, 489 U.S. at 619. In other words, "[t]he ultimate standard set forth in the Fourth Amendment is reasonableness." *Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). In defining the Fourth Amendment's touchstone of reasonableness in a criminal context, the United States Supreme Court has repeatedly held that searches conducted without a warrant "'"are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions."'" *Los Angeles v. Patel*, 576 U.S. ___, 135 S. Ct. 2443, 2452, 192 L. Ed. 2d 435 (2015) (quoting *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 [2009]; *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 [1967]); see *State v. Johnson*, 297 Kan. 210, 223, 301 P.3d 287 (2013); *State v. Sanchez-Loredo*, 294 Kan. 50, 55, 272 P.3d 34 (2012).

This "warrant requirement" espouses a marked preference for searches authorized by detached and neutral magistrates to ensure that searches "are not the random or arbitrary acts of government agents," but rather intrusions "authorized by law" and "narrowly limited" in objective and scope. *Skinner*, 489 U.S. at 621-22. Consequently, "police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

As we touched on before, one of the established and well-delineated exceptions to the warrant requirement is an individual's consent to a search. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *Johnson*, 297 Kan. at 223. Other exceptions include "search incident to a lawful arrest; stop and frisk; probable cause plus exigent circumstances; the emergency doctrine; inventory searches; plain view or feel; and administrative searches of closely regulated businesses." *Johnson*, 297 Kan. at 223. None of these exceptions rests solely on probable cause, although most require probable cause plus other circumstances for a warrant exception to apply. See *Katz*, 389 U.S. at 357 ("Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause.'").

The State relies on many of the warrant exceptions to argue that Ryce had no constitutional right to refuse the deputy's request that Ryce submit to testing. According to the State, beyond consent, one of the other exceptions can provide a constitutional and categorical basis to search DUI suspects. Thus, according to the State, even if Ryce successfully argues he had a right to withdraw his consent he cannot meet his burden of establishing the facial unconstitutionality of 8-1025.

The State's arguments about the application of other exceptions gives us pause because the plain language of 8-1025 provides a specific penalty limited to the refusal to submit to a search "deemed consented to." Indeed, to administer a test "deemed consented to," an officer must take specific steps, such as providing the person with oral and written notices of a variety of rights and consequences. K.S.A. 2014 Supp. 8-1001(k). If an officer relied on something else to search, *i.e.*, a warrant or a warrant exception other than consent, then the withdrawal of consent—or even the presence of express consent—would be irrelevant to the authority to perform the test. As it stands, the United States Supreme Court has recently provided a test establishing the proper scope of our consideration as to whether Ryce met his burden of establishing facial unconstitutionality. Consequently, we next turn to a consideration of that test.

*3. What is the test to be applied to Ryce's facial challenge of 8-1025?*

The State relies on the traditional explanation of the facial un-constitutionality test. As stated in *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987): "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances* exists under which the Act would be valid." (Emphasis added.) The State, by pointing to warrant exceptions other than consent, essentially argues there are some circumstances in which the Fourth Amendment would permit an officer to require a driver to submit to a test even if the consent exception did not apply. In those situations, the driver would have no constitutional right to refuse. Consequently, the State argues, Ryce cannot establish that there is "no set of circumstances" under which 8-1025 could be constitutionally applied. The dissent agrees with this position. But, as recently explained by the United States Supreme Court in *Patel*, 576 U.S. ___, 135 S. Ct. 2443, a decision filed after the oral arguments in this case, the State and dissent use too wide a lens. *Patel* emphasizes that when it comes to Fourth Amendment challenges, the "no set of circumstances" test becomes more focused. *Patel* emphasizes that the scope of circumstances we examine is determined and limited by the application of the statute—we do not consider the entire universe of possible scenarios, we must instead look to the circumstances actually affected by the challenged statute. 576 U.S. at ___, 192 L. Ed .2d at 2451.

*Patel* involved a facial challenge to a Los Angeles city ordinance authorizing police officers to inspect hotel records without a search warrant. The hotel operator argued that the ordinance violated the Fourth Amendment, and in response, Los Angeles pointed out hypothetical circumstances in which a search would be *constitutionally* appropriate regardless of any statutory authority—such as when police were responding to an emergency, a hotel operator consented, or officers had a warrant. Because such circumstances would occasionally exist, Los Angeles reasoned it could not be said that the statute operated unconstitutionally in *all* circumstances, even if *some* searches pursuant to the ordinance did not comply

with the Fourth Amendment. As a result—at least according to Los Angeles—the ordinance could not be subject to a facial attack.

The *Patel* Court rejected this argument, however, noting that these scenarios envisioned by Los Angeles—though they might have justified the search on a basis *separate* from the ordinance—were irrelevant to a determination of whether the ordinance was facially valid. The Court determined that in the context of the Fourth Amendment, the appropriate focus of a claim of facial unconstitutionality is to consider "only applications of the statute in which it actually authorizes or prohibits conduct." In other words, "'[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.'" 576 U.S. at ___, 135 S. Ct. at 2451 (quoting *Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 894, 112 S. Ct. 2791, 120 L. Ed. 2d 674 [1992]). Other warrant exceptions, which might have justified the search under circumstances not contemplated by the ordinance, were irrelevant to a determination of whether the ordinance was facially valid.

The *Patel* Court observed that this approach was necessary when dealing with the Fourth Amendment because the "no set of circumstances" rule would "preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches," in part because the determination of the reasonableness of a search is inherently factual. 576 U.S. at ___, 135 S. Ct. at 2450-51. The Court further explained:

"If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do not work where the subject of a search has consented. Accordingly, the constitutional 'applications' that petitioner claims prevent facial relief here are irrelevant to our analysis because they do not involve actual applications of the statute." 576 U.S. at ___, 135 S. Ct. at 2451.

In sum, the officer would not be relying on the search authorizing ordinance if there was some other constitutional basis for the search. There would always be a hypothetical set of circumstances where a warrantless search would be reasonable. But those sets of circumstances, the *Patel* Court explained, are not the focus of facial challenges.

While the *Patel* opinion focused on the city ordinance authorizing a warrantless search (comparable in our case to 8-1001), the Court briefly noted the effect of a separate statute that penalized refusal to submit to the search (somewhat comparable, in our case, to 8-1025). The penalty provision at issue in *Patel* was a general statute that applied to any interference with the duty of an officer. *Cf.* K.S.A. 2014 Supp. 21-5904(a)(3) (defining the crime of interference with law enforcement as "knowingly obstructing, resisting or opposing any person authorized by law to serve process in the service or execution or in the attempt to serve or execute any writ, warrant, process or order of a court, or in the discharge of any official duty"). Because the Los Angeles penalty provision applied to a person's failure to cooperate with all searches, including those authorized by a warrant, a warrant exception, *or* the search ordinance, the city argued that the search ordinance could be read to "match" the penalty provision—meaning it should have "independent effect" and cover all circumstances where an officer would be constitutionally entitled to search the hotel's records. See 576 U.S. at ___ n.1, 135 S. Ct. at 2451 n.1.

The *Patel* Court rejected this argument, stating: "This argument gets things backwards. An otherwise facially unconstitutional statute cannot be saved from invalidation based solely on the existence of a penalty provision that applies when searches are not actually authorized by the statute." 576 U.S. at ___ n.1, 135 S. Ct. at 2451 n.1. The converse would also be true: A facially unconstitutional penalty statute cannot be saved based on the possibility of a constitutional search justified by an exception not mentioned in the penalty statute, 8-1025.

Thus, in applying *Patel* to this case, we must focus on the language of K.S.A. 2014 Supp. 8-1025, which defines the criminal conduct as a "refus[al] to submit to or complete a test or tests *deemed consented to* under subsection (a) of K.S.A. 8-1001," and on K.S.A. 2014 Supp. 8-1001(a), which also refers to circumstances where a driver is "deemed to have given consent." (Emphasis added.) In *State v. Garner*, 227 Kan. 566, 572, 608 P.2d 1321 (1980), we recognized that a driver "withdraw[s] that [implied] consent by expressly refusing the test." In other words, 8-1025 specifically criminalizes the withdrawal of consent.

As in *Patel*, a warrant or some warrant exception (such as exigent circumstances) might sometimes justify the State demanding a DUI suspect submit to testing, irrespective of any implied consent provided by 8-1001. See *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552, 1561, 185 L. Ed. 2d 696 (2013) (recognizing DUI investigations can present "circumstances [that] will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test"). Indeed, Kansas' general obstruction statute, K.S.A. 2014 Supp. 21-5904(a)(3), might punish those situations as interfering with the execution of a warrant or otherwise interfering in the "discharge of official duty" without need to resort to 8-1025. See K.S.A. 2014 Supp. 8-1001(b) ("[a] law enforcement officer shall request a person to submit to a test"). Moreover, it is conceivable that a suspect might be charged for refusing to submit to a test "deemed consented to" under 8-1025, and then, after an officer obtains a warrant, subsequently be charged for obstruction under 21-5904(a)(3) for resisting the warrant search. While not entirely clear from the slim record, this appears to have been the situation in another case this day decided, *State v. Wilson*, 303 Kan. 973, 368 P.3d 1086 (2016).

K.S.A. 2014 Supp. 8-1025 does not contain broad language penalizing failure to cooperate with a warrant search or a search conducted pursuant to a warrant exception; it does not generally criminalize a suspect's obstruction of a valid search. Rather, it narrowly and unambiguously penalizes a driver for refusing to submit to a search "deemed consented to." Contrary to the dissent's position, we cannot read 8-1025 to apply to a failure to cooperate with a search conducted pursuant to a warrant. By its own terms, the statute applies when certain persons "refus[e] to submit to or complete a test or tests deemed consented to under subsection (a) of K.S.A. 8-1001." When that person has expressly refused consent—which would make the warrant necessary—it would be incongruous and oxymoronic to say the person was deemed to have consented to the test. Even under the principle of constitutional avoidance, whereby we choose between competing plausible statutory interpretations so as to avoid deciding constitutional questions, we are precluded

from adding words to or striking words from 8-1025 to criminalize any action other than refusing to submit to a test deemed consented to—that is, we cannot read 8-1025 to do more than criminalize the withdrawal of implied consent. See *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 367, 361 P.3d 504 (2015) ("[T]he court's duty to give effect to the plain language of an unambiguous statute is not diluted just because that effect renders the statute unconstitutional. . . . '[W]e cannot use the doctrine of constitutional avoidance to change the meaning of unambiguous statutory language.'").

Consequently, under *Patel*, Ryce can meet his burden of establishing that 8-1025 is facially unconstitutional if he persuades us that the State cannot punish him for revoking his implied consent. We recognize this is somewhat of an analytical departure from prior facial challenges and that the State relies on the cases decided without the benefit of *Patel*'s guidance. To examine whether *Patel* affects the persuasiveness of those opinions, we examine those cases.

### 4. How do past cases upholding nonconsensual searches impact our analysis?

When considering the constitutionality of searches conducted in situations where a driver (1) refuses to submit to testing under the implied consent statute or (2) is physically unable to expressly consent to testing, historically this court and others have not relied on the consent exception but have looked to other, categorical exceptions to the warrant requirement—that is, per se exceptions that would always apply when the conditions of an implied consent statute, such as 8-1001, are satisfied. Most often, in the absence of express consent, Kansas caselaw has constitutionally justified testing a DUI suspect's bodily substances by relying on the warrant exceptions of (1) search incident to arrest or (2) probable cause plus exigent circumstances arising from the evanescent nature of blood alcohol content, which naturally dissipates in the bloodstream—*i.e.*, the evanescent evidence exception. *E.g., Murry*, 271 Kan. at 226 (citing *Schmerber v. California*, 384 U.S. 757, 767, 86 S. Ct. 1826, 16 L. Ed. 2d 908 [1966], to invoke exigent circumstances exception when conscious driver did not consent); *Garner*, 227 Kan.

at 571-72 (citing *Schmerber* and invoking search incident to arrest exception in case where DUI suspect was unconscious and unable to expressly consent or withdraw consent). As we will discuss, recent cases from other jurisdictions have relied on the search incident to arrest exception, the special needs exception, and a general reasonableness test.

Most cases relying on a categorical exception to the warrant requirement trace back to *Schmerber*, which represents the Supreme Court's first foray into considering intrusions into the human body. *Schmerber*, 384 U.S. at 767-68 ("[W]e write on a clean slate."). Armando Schmerber was arrested at a hospital while receiving treatment for injuries after a car crash. When Schmerber refused to submit to a blood test, a police officer directed medical personnel to draw and test a blood sample. The results of the blood test were admitted at trial over Schmerber's objections that this evidence violated his Fourth Amendment rights, and Schmerber was convicted of driving under the influence.

The Supreme Court ultimately upheld the admission of evidence obtained from this warrantless search. The Court concluded the arresting officer in *Schmerber* "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" 384 U.S. at 770-71. The Supreme Court was particularly concerned with the body's natural metabolization of alcohol, and it noted that the arresting officer had brought the accused to a hospital and there was no time to secure a warrant before the evidence disappeared. 384 U.S. at 770. The Supreme Court also held that blood tests are "commonplace" and a reasonable method to test blood-alcohol level, as they extract minimal amounts of blood and the procedure involves almost no risk or pain. 384 U.S. at 771. "Given these special facts," the Court concluded, "an attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." 384 U.S. at 771. The *Schmerber* Court cautioned, however, that while it held "that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions," its

decision "in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." 384 U.S. at 772.

In *State v. Brunner,* 211 Kan. 596, 602, 507 P.2d 233 (1973), *disapproved on other grounds by State v. Murry,* 271 Kan. 223, 21 P.3d 528 (2001), this court quoted *Schmerber,* 384 U.S. at 771, and read it to "hold that the warrantless arrest of the accused was valid, having been made on probable cause, and that the subsequent 'search' by way of the blood sample 'was an appropriate incident to petitioner's arrest.'" The court did, however, also cite to cases recognizing the evanescent nature of blood alcohol content. 211 Kan. at 602 (citing, *e.g. United States v. Dionisio,* 420 U.S. 1, 8, 93 S. Ct. 764, 35 L. Ed. 2d 67 [1973]).

This court's subsequent decision in *Garner* illustrates how, at least for a period of time, this court categorically tied the constitutionality of a nonconsensual test under 8-1001 to the search incident to arrest exception. The *Garner* court stated that "[t]he constitution permits the taking of a blood or breath test as an incident to arrest, regardless of refusal under the conditions" of the statute. *Garner,* 227 Kan. at 571.

Cases latching onto the search-incident-to-arrest language in *Schmerber* remove the language from its context. The *Schmerber* Court declined to conclude that probable cause alone would justify a search within a suspect's body. 384 U.S. at 768. In so doing, it recognized cases suggesting the police possessed "an unrestricted 'right . . . to search the person of the accused when legally arrested, to discover and seize the fruits or evidence of crime.'" 384 U.S. at 769 (referencing two factors supporting this suggestion: first, concerns about officer safety and destruction of evidence, and second, the fact that it would be impractical to attempt to confine a search only to weapons). But the *Schmerber* Court declined to extend this exception wholesale to DUI-type cases because officer safety and destruction of evidence considerations had "little applicability with respect to searches involving intrusions beyond the body's surface." 384 U.S. at 769. Instead, the Supreme Court stated: "In the absence of a clear indication that in fact such evidence [of intoxication] will be found, these fundamental human interests [in dignity and privacy] require law officers to suffer the risk that such evidence may

disappear unless there is an immediate search." 384 U.S. at 770. The Court also compared the situation to a search of a dwelling, which ordinarily requires a warrant, and stated that "'absent an emergency, no less could be required where intrusions into the human body are concerned', *even when the search was conducted following a lawful arrest*." (Emphasis added.) McNeely 569 U.S. at ___, 133 S. Ct. at 1558 (quoting *Schmerber*, 384 U.S. at 770).

In essence, neither of the two purposes traditionally underlying the search incident to lawful arrest exception (officer safety and preservation of evidence) applies to the testing of blood alcohol content. See *Riley v. California*, 573 U.S. ___, 134 S. Ct. 2473, 2484, 189 L. Ed. 2d 430 (2014) (discussing cases beginning with *Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 [1969], establishing and applying two-part test for search incident to arrest: officer safety and destruction of evidence within the control of the arrestee). Alcohol in the bloodstream poses no threat to officer safety, and when discussing preservation of evidence with respect to the search incident to lawful arrest exception (as distinct from the evanescent evidence exception), the reasoning is to prevent destruction of evidence *within a suspect's control*. See, *e.g.*, *Arizona v. Gant*, 556 U.S. 332, 335, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). Evidence of alcohol within the bloodstream is not in a suspect's control once he or she is monitored and will diminish at a predictable rate. See *State v. Milligan*, 304 Or. 659, 671, 748 P.2d 130 (1988). Consequently, *Schmerber* indicates that a warrantless search of bodily substances for blood alcohol content cannot be justified by the search incident to arrest exception, even if it does not explicitly espouse that holding. Moreover, the Supreme Court has recently emphasized that the search incident to arrest exception was limited to "'personal property . . . immediately associated with the person of the arrestee.'" *Riley*, 573 U.S. at ___, 134 S. Ct. at 2484.

Perhaps because of the *Schmerber*·Court's recognition that blood alcohol content testing did not meet the two-prong test for the search incident to arrest exception, this court moved away from reliance on the exception and toward categorical use of an exigent circumstances exception, particularly exigencies posed by the evanescent nature of alcohol in the bloodstream. In *Murry*, this court

disapproved of any language in *Brunner* implying that an arrest is constitutionally required before a blood sample may be taken. *Murry*, 271 Kan. at 233. We recognized that *Schmerber* created a three-part test to determine whether a warrantless blood draw was reasonable: (1) There must be exigent circumstances such that the delay needed to obtain a warrant would threaten the destruction of evidence, (2) there must be probable cause to believe that the suspect has been driving under the influence of alcohol, and (3) the procedures used to extract the blood must be reasonable. 271 Kan. at 227. Applying these factors, the court concluded all three prongs were easily met when testing occurs under 8-1001. As to the first prong, the court broadly held that "blood alcohol evidence can be taken from a suspect without a warrant . . . because of the exigency created by the evanescent nature of blood alcohol and the danger that important evidence would disappear without an immediate search." 271 Kan. 223, Syl. ¶ 2. Regarding the other prongs, the specific provision in 8-1001 invoked by the officer required the officer to have probable cause and, as the *Schmerber* Court had concluded, the extraction of blood was reasonable. 271 Kan. at 233; see *Schmerber*, 384 U.S. at 770.

After the broad holding in *Murry* recognizing the evanescent evidence exception for blood alcohol testing, Kansas courts strayed from a case-by-case analysis and categorically held that warrantless, nonconsensual searches were reasonable. Along the way, this court cited other United States Supreme Court cases for support, including *South Dakota v. Neville*, 459 U.S. 553, 559, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983) (discussing the Fifth—not Fourth—Amendment but broadly stating that "*Schmerber* . . . clearly allows a State to force a person suspected of driving while intoxicated to submit to a blood-alcohol test"); 459 U.S. at 560 n.10 (still discussing the Fifth—not Fourth—Amendment but broadly stating that "a person suspected of drunk driving has no constitutional right to refuse to take a blood-alcohol test"). See, *e.g.*, *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 635-36, 176 P.3d 938 (2008) (considering whether illegal seizure required suppression of alcohol testing during administrative proceeding to revoke license; citing *Neville* and *Schmerber* and stating testing based on implied

consent "is reasonable in light of the State's compelling interest in safety on the public roads"), *abrogated on other grounds by City of Atwood v. Pianalto*, 301 Kan. 1008, 1011-13, 350 P.3d 1048 (2015); *State v. Bristor*, 236 Kan. 313, 315, 691 P.2d 1 (1984) (rejecting a driver's argument challenging his express consent to a breath test on the grounds he was not allowed to consult with counsel and not given *Miranda* warnings and citing *Schmerber* for the proposition that "blood test does not violate the Fourth Amendment right to be free of unreasonable searches and seizures"); *Standish v. Department of Revenue*, 235 Kan. 900, 904, 683 P.2d 1276 (1984) (stating, in a license revocation proceeding, that "blood test does not violate the Fourth Amendment right to be free of unreasonable searches and seizures; it is a reasonable test").

Like Kansas, other jurisdictions also read *Schmerber, Neville*, and other United States Supreme Court cases as recognizing a per se evanescent evidence exception when the state tested the blood alcohol content of DUI suspects. But not all did so. Recently, several courts discussed how technological advances in testing, as well as increased ease of acquiring a search warrant via electronic communication between law enforcement officials and a neutral magistrate, undermined the use of the evanescent nature of blood alcohol evidence as a justification for a categorical exception to the warrant requirement in DUI cases. The United States Supreme Court resolved the split in *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1563 (collecting cases reflecting the two readings of *Schmerber*).

In *McNeely*, a Missouri DUI suspect refused breath and blood testing. Missouri had an implied consent statute markedly similar to 8-1001. See Mo. Ann. Stat. §§ 577.020.1; 577.041 (West 2011). Despite the driver's refusal, a law enforcement officer, acting under the authority of the Missouri implied consent statute, ordered a blood test without obtaining a warrant. The Court focused on the question of whether "the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for *nonconsensual* blood testing in drunk driving situations." (Emphasis added.) 569 U.S. at ___, 133 S. Ct. at 1558; see *State v. McNeely*, 358 S.W.3d 65, 69 (Mo. 2012), *aff'd* 133 S. Ct. 1552 (2013).

The Supreme Court rejected a per se or categorical rule and declined to read *Schmerber* as a license to "depart from careful case-by-case assessment of exigency." 569 U.S. at ___, 133 S. Ct. at 1561. Although the Court acknowledged the natural metabolization of alcohol in the bloodstream, the Court noted at least three contrary considerations that led it to reject a per se exception to the warrant requirement for blood alcohol testing: (1) The dissipation was gradual and not a "'now or never'" situation, (2) the nature of the testing already necessitates some delay while transporting the suspect, and (3) communication technology "advances in the 47 years since *Schmerber* was decided . . . allow for the more expeditious processing of warrant applications." 569 U.S. at ___, 133 S. Ct. at 1561; see 569 U.S. at ___, 133 S. Ct. 1562 (discussing telephonic and electronic warrants, communication between law enforcement officers and magistrates by e-mail and videoconferencing, and use of standardized warrant applications in DUI cases); see also K.S.A. 2014 Supp. 22-2502(a) ("A search warrant shall be issued only upon the oral or written statement, *including those conveyed or received by electronic communication.*"[Emphasis added.]).

Rather than approve reliance on a per se or categorical warrant exception, the Supreme Court held that "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *McNeely*, 569 U.S. ___, 133 S. Ct. at 1561. Whether circumstances supported "an exigency justifying a properly conducted warrantless blood test" must be decided on a case-by-case basis. 569 U.S. at ___, 133 S. Ct. at 1561.

Post-*McNeely*, courts have heeded the United States Supreme Court's concern about "the 'considerable overgeneralization' that a *per se* rule would reflect. [Citation omitted.]" 569 U.S. at ___, 133 S. Ct. at 1561. And while *McNeely* clearly set aside reliance on a per se rule relating to evanescent evidence, some courts have interpreted the United States Supreme Court's subsequent remand of *Aviles v. Texas*, 571 U.S. ___, 134 S. Ct. 902, 187 L. Ed. 2d 767 (2014), for application of *McNeely* to indicate *no* per se or categorical exception should be made for blood alcohol testing.

For example, a Texas informed consent statute mandated a blood draw when an arresting officer had a credible reason to believe from a reliable source that a DUI suspect had two or more prior DUI convictions. On remand of *Aviles*, the Texas Court of Appeals held that this provision created an unconstitutional, categorical per se exception to the warrant requirement. *Aviles v. State*, 443 S.W.3d 291 (Tex. App. 2014), *petition for discretionary rev. filed* August 8, 2014. The Texas Court of Appeals likewise found unconstitutional another provision of its implied consent statute allowing a mandatory blood test—one relating to the suspect being involved in an injury accident. *Weems v. State*, 434 S.W.3d 655, 665 (Tex. App. 2014), *rev. granted* August 20, 2014. The various panels of the Texas Court of Appeals reached these holdings because they read the Supreme Court's rulings in *McNeely* and *Aviles* to (1) proscribe all categorical or per se rules for warrantless blood testing and (2) emphasize that the reasonableness of a search must be judged on the totality of the circumstances.

Likewise, the Kansas Court of Appeals, citing *McNeely*, has reached similar conclusions and, as a result, has held that statutory implied consent cannot categorically justify all blood alcohol testing. *State v. Declerck*, 49 Kan. App. 2d 908, 909, 922, 317 P.3d 794, *rev. denied* 299 Kan. 1271 (2014); *State v. Dawes*, 2015 WL 5036690 (Kan. App. 2015) (unpublished opinion). In addition, courts in Idaho and Nevada have held their respective state's implied consent law violated the Fourth Amendment to the extent the statute allowed a search based solely on implied consent. *State v. Wulff*, 157 Idaho 416, 421-23, 337 P.3d 575 (2014); *Byars v. State*, 336 P.3d 939, 945-46 (Nev. 2014).

We need not decide at present whether we agree with the holdings of our Court of Appeals and these other courts regarding the existence of a categorical warrant exception for implied consent or any other exception. That is because in Ryce's case, officers did not conduct a search in reliance on implied consent—indeed, there was no search—and Ryce does not challenge the constitutionality of those provisions in 8-1001 that rely on implied consent as the basis for a search.

Nevertheless, we cite these cases discussing the existence of any categorical exceptions to the warrant requirement in DUI-type cases because they inform our analysis of the cases cited by the parties in their attempts to explain the legal landscape before and after *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552, 1561, 185 L. Ed. 2d 696 (2013), which altered some prevalent legal assumptions about Fourth Amendment searches of DUI suspects. In essence, post-*McNeely* decisions fall into two camps. One camp reads *McNeely* to indicate *only* that the exigent circumstances arising from the evanescent nature of DUI evidence cannot be applied categorically; this camp leaves open the option that some other exception might apply categorically. The second reads *McNeely* to indicate that *no* warrant exception can categorically justify a DUI search. Recognizing these distinctions becomes especially important as we consider the impact of *Los Angeles v. Patel*, 576 U.S. ___, 135 S. Ct. 2443, 192 L. Ed. 2d 435 (2015), on decisions upholding the constitutionality of criminal refusal statutes, almost all of which predate *Patel*.

In large part, the courts that ultimately find a criminal refusal statute constitutional agree that the primary question is whether the State could have tested a suspect *regardless* of a person's consent (or lack thereof). In other words, the courts cast the underlying inquiry as being whether, had a search been performed without a person's consent, the search would have been reasonable under any other Fourth Amendment warrant exception. See, *e.g.*, *Burnett v. Municipality of Anchorage*, 806 F.2d 1447, 1450 (9th Cir. 1986) ("Consent in the constitutional sense is only required where the defendant has a legal right to refuse."); *Williams v. State*, 167 So. 3d 483, 487 (Fla. Dist. App. 2015) ("If [the defendant] had a Fourth Amendment right to refuse a breath test, criminalizing his assertion of that right would be unconstitutional."); *State v. Hoover*, 123 Ohio St. 3d 418, 423, 916 N.E.2d 1056 (2009) ("Asking a driver to comply with conduct he has no right to refuse . . . does not violate the constitution.").

Most of these cases have relied on an exception to the warrant requirement—usually the search incident to arrest exception, the exigent circumstances exception arising because of the evanescent

nature of blood alcohol evidence, or the special needs exception and its related examination of whether an intrusion is negligible and the search is reasonable. Several states have employed a general reasonableness analysis untethered from any warrant exception. In other words, these decisions have relied on the existence of a categorical warrant exception, as the State tries to argue here. Presumably, application of a categorical exception would obviate the need to conduct a case-by-case analysis of constitutionality. Courts have imposed similar reasoning to uphold nonconsensual searches under an implied consent statute. See, *e.g.*, *Burnett*, 806 F.2d at 1450 (pre-*McNeely*; examining Alaska's implied consent statute and holding "the breathalyzer examination in question is an appropriate and reasonable search incident to arrest which appellants have no constitutional right to refuse"); *Williams*, 167 So. 3d at 492-93 (post-*McNeely*; holding that a warrantless post-arrest breath test is permissible under general reasonableness test); *State v. Won*, 136 *Hawaii* 292, 361 P.3d 1195 (2015) (post-*McNeely*; holding that general reasonableness is not a warrant exception; the legislature cannot create a per se warrant exception by enacting an implied consent statute; and consent to a search may be revoked or withdrawn at any time before the search has been completed), *vacating* 134 *Hawaii* 59, 77-79, 332 P.3d 661 (Hawaii App. 2014) (holding that warrantless post-arrest breath test is permissible under general reasonableness test); *State v. Bernard*, 859 N.W.2d 762 (Minn. 2015) *cert. granted* 136 S. Ct. 615 (2015) (post-*McNeely*; categorically applying search incident to arrest exception to validate test refusal statute in situation of a breath test but specifically leaving open the question of whether the categorical exception applies to blood or urine tests), *aff'd on other grounds*, 844 N.W.2d 41 (Minn. App. 2014) (post-*McNeely*; finding a criminal refusal statute reasonable because probable cause existed to believe that a defendant had been driving while impaired, which would have supported issuance of a search warrant to require defendant to submit to test); *State v. Trahan*, 870 N.W.2d 396, 403-04 (Minn. App. 2015) (distinguishing Minnesota Supreme Court decision in *Bernard*, which held breath test could be performed under search incident to arrest exception, and concluding: the same exception did

not apply to blood test, exigent circumstances did not justify a warrantless search, and the test refusal statute as applied to defendant deprived defendant of due process); *State v. Wiseman*, 816 N.W.2d 689, 694 (Minn. App. 2012) (pre-*McNeely*; holding Minnesota's implied consent statute was not based on consent but on probable cause and exigent circumstances); *State v. Turner*, 263 Neb. 896, 899, 644 N.W.2d 147 (2002) (pre-*McNeely*; citing *Neville*, 459 U.S. 553, to conclude that an implied consent statute "does not involve a question of involuntariness, want of due process, or self-incrimination," and that the right to refuse a chemical test is "governed purely by statute"); *State v. Birchfield*, 2015 ND 6, 858 N.W.2d 302 (2015), *cert. granted* 136 S. Ct. 614 (2015) (post-*McNeely*; relying on special needs exception and general reasonableness to justify a search); *Hoover*, 123 Ohio St. 3d at 423 (pre-*McNeely*; relying on probable cause alone, independent of any warrant exception, to justify search); *Rowley v. Com.*, 48 Va. App. 181, 187, 629 S.E.2d 188 (2006) (pre-*McNeely*; holding implied consent is irrevocable and citing *Burnett*, which relied on exigency, as authority); see also *State v. Isaacson*, No. A13-1245, 2014 WL 1271762 (Minn. App. 2014), (unpublished opinion) *rev. granted* June 17, 2014 (agreeing with the Minnesota Court of Appeals' reasoning in *Bernard*, 844 N.W.2d 41); *State v. Chasingbear*, No. A14-0301, 2014 WL 3802616 (Minn. Ct. App. 2014) (unpublished opinion) (post-*McNeely*; citing *Neville* for the proposition that any right to refuse testing is statutory, not constitutional, and so the right to refuse is not a fundamental right and also concluding the criminal refusal statute survives rational basis scrutiny); *State v. Poitra*, No. A14-0572, 2014 WL 3892709 (Minn. App. 2014) (unpublished opinion), *rev. granted* October 14, 2014 (not discussing *McNeely*; holding the Fourth Amendment does not apply to criminal refusal statute because no search occurs and noting that defendant did not raise a due process argument); *State v. Ornquist*, No. A13-1590, 2014 WL 2565662 (Minn. App. 2014) (unpublished opinion) (same); *State v. Johnson*, No. A13-2252, 2014 WL 2565771 (Minn. App.) (unpublished opinion), *rev. granted* (2014) (same).

We agree with Ryce that after *McNeely* there may be grounds to question any case that categorically applies a warrant exception to

blood alcohol testing. In fact, as discussed, some courts have read *McNeely* to prohibit categorical reliance on *any* warrant exception. Still other courts remain open to the possibility of a categorical exception, but after examining the tests or principles relating to one or more exceptions, have determined that categorical application of the warrant exception or exceptions do not apply to DUI investigations. See *State v. Fierro*, 2014 S.D. 62, 853 N.W.2d 235 (recognizing a driver's right to withdraw consent and holding that if a driver does so the consent exception to warrant requirement cannot justify blood alcohol testing, and also concluding that the special needs exception to the warrant requirement does not apply in the DUI context); *State v. Villarreal*, 2014 WL 6734178 (Tex. Crim. 2014) (analyzing each warrant exception and concluding none could be applied categorically to DUI testing), *opinion on denial of rehearing* 475 S.W.3d 784, (Tex. Crim. 2015).

Nevertheless, we know from *McNeely* that, if anything, at times the evanescent evidence exception may apply when under the totality of circumstances a delay in obtaining a warrant would mean that a valid test could not be performed. *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552, 1561, 185 L. Ed. 2d 696 (2013). Thus, in circumstances where the evanescent evidence exception applies, a search would be reasonable under the Fourth Amendment and a driver would arguably not have any Fourth Amendment right to refuse to cooperate with a test. So, if we were to look to whether any or all warrant exceptions applied (and, in particular, the exigent circumstances exception arising because of the evanescent nature of the evidence), the question of whether the State could constitutionally charge an 8-1025 violation would necessarily be decided on a case-by-case basis. Recalling our previous discussion of the facial unconstitutionality test, the *possibility* that the evanescent evidence exception would apply means that there are some theoretical circumstances where a search is reasonable regardless of implied consent and some theoretical circumstances where a defendant would correspondingly have no Fourth Amendment right to refuse. See *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount success-

fully, since the challenger must establish that *no set of circumstances* exists under which the Act would be valid." [Emphasis added.]).

But under *Patel*, in Fourth Amendment situations we do not consider the entire universe of possible, theoretical circumstances; we must only apply the plain language of 8-1025 and consider the circumstances where that statute is relevant. K.S.A. 2014 Supp. 8-1025 depends on statutory implied consent and a driver's express refusal—an express withdrawal of consent—to testing. We recognize that, pre-*Patel*, courts examining whether any warrant exception justifies a nonconsensual search have applied criminal refusal statutes that are worded in a manner similar to 8-1025. See, *e.g.*, Alaska Stat. § 28.35.032 (2014); Fla. Stat. § 316.1939 (2014); Minn. Stat. § 169A.20 (2006). Nevertheless, in light of *Patel*, and given the wording of 8-1025 and our caselaw indicating that refusal to submit to testing is really withdrawal of consent, our decision regarding whether 8-1025 is constitutional under Fourth Amendment principles ultimately depends on the application of the consent exception alone. Similar to *Patel*, if an officer requested to search a DUI suspect based on a warrant or some other warrant exception, the officer would not be "deeming" the person to have consented. Consent would be irrelevant.

Consequently, we next examine Fourth Amendment caselaw regarding the consent exception and the recognition of the right to withdraw consent.

### 5. Is implied consent in Kansas irrevocable consent?

The State argues implied consent is irrevocable. If true, the State would have its categorical exception to the warrant requirement—consent—and Ryce's refusal to submit would not be an act protected by the Fourth Amendment. We reject that argument.

In *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), the United States Supreme Court reiterated that "'[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.' *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S. Ct. 1788, 20 L. Ed. 2d

797 [1973]." To be free and voluntary, "the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." 412 U.S. at 228. The determination of "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances" and "knowledge of the right to refuse consent is one factor to be taken into account." 412 U.S. at 227.

Consistent with the requirement of voluntariness, the Supreme Court has recognized that "[a] suspect may of course delimit as he chooses the scope of the search to which he consents." *Florida v. Jimeno*, 500 U.S. 248, 252, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991). And, in a broader sense, a consensual encounter or search "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991).

In light of those principles, courts have generally recognized that, "[a]s a corollary of the requirement that consent to a search must be voluntary, consent to a search may be revoked or withdrawn at any time before the search has been completed." *Won*, 136 Hawaii at 307 (holding DUI suspect had a state constitutional right to withdraw implied consent); see also *United States v. Ortiz*, 669 F.3d 439, 445 (4th Cir. 2012) (any consent given is valid until it is withdrawn by the defendant); *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999) (party consenting to search "at any moment may retract his consent"); *United States v. Lattimore*, 87 F.3d 647, 651 (4th Cir. 1996) ("'A consent to search is not irrevocable, and thus if a person effectively revokes . . . consent prior to the time the search is completed, then the police may not thereafter search in reliance upon the earlier consent.'"); *United States v. Mitchell*, 82 F.3d 146, 151 (7th Cir. 1996) ("Consent to search may, of course, be withdrawn or limited by a criminal suspect."); *United States v. McFarley*, 991 F.2d 1188, 1191 (4th Cir. 1993) ("[O]nce consent is withdrawn or its limits exceeded, the conduct of the officials must be measured against the Fourth Amendment principles."); *United States v. Carter*, 985 F.2d 1095, 1097 (D.C. Cir. 1993) (recognizing a constitutional right to withdraw one's consent to a search);

*Won*, 136 Hawaii at 306-07 (collecting additional cases); 4 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.1(c) (5th ed. 2012) ("[C]onsent usually may be withdrawn or limited at any time prior to the completion of the search.").

We applied these principles in *State v. Edgar*, 296 Kan. 513, 294 P.3d 251 (2013), in which we considered whether a suspect could revoke an implied consent under K.S.A. 2010 Supp. 8-1012(a) (whereby a person is "deemed to have given consent to submit to a preliminary screening test" for alcohol and drugs). The police officer in *Edgar* told the suspect that he did not have a right to refuse a preliminary breath test, which misstated the law; because of that mistake, the driver argued his express consent was coerced and invalid. Ultimately, we agreed. 296 Kan. at 526, 530. In reaching that conclusion, we noted the preliminary breath test statute "provides that a driver's refusal to take the test is a traffic infraction, which means that refusal is always an option for the driver." 296 Kan. at 527. We also cited *Ortiz*, 669 F.3d at 445, and *Carter*, 985 F.2d at 1097, for the propositions that (1) any consent to a search is valid until it is withdrawn and (2) the right to withdraw consent is a constitutional right. 296 Kan. at 527.

Nevertheless, the State presents an argument not raised in *Edgar*: whether the acceptance of a privilege—specifically, the right to operate or attempt to operate a vehicle in Kansas—in exchange for implied consent makes the implied consent irrevocable. If implied consent *is* irrevocable (and assuming it meets the Fourth Amendment requirements for valid consent), then the consent exception rendered the proposed search in Ryce's case reasonable and limited or perhaps even destroyed any right he had to refuse. In reality, however, the State's arguments for irrevocable consent are based on already defined exceptions to the warrant requirement. Like its arguments for application of the search incident to arrest exception, we find the following exceptions inapplicable and insufficient to render consent irrevocable.

The State cites three United States Supreme Court decisions in support of its argument that Kansas' implied consent law establishes that every driver has given irrevocable consent to testing as provided for under 8-1001: *Samson v. California*, 547 U.S. 843,

126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006); *Board of Ed. of Dist. 92 of Pottowatomie Cty. v. Earls*, 536 U.S. 822, 122 S. Ct. 2559, 153 L. Ed. 2d 735 (2002); and *Zap v. United States*, 328 U.S. 624, 66 S. Ct. 1277, 90 L. Ed. 2d 1477 (1946), *vacated by* 330 U.S. 800 (1947). We find each of these cases distinguishable and unpersuasive.

*Samson* addressed a search conducted pursuant to a California law that allowed parole officers to search a parolee or the parolee's property without a warrant and even without suspicion. As a condition of receiving parole, the law required a prisoner to clearly and unambiguously agree to the terms of the warrantless searches. Significant to our considerations in Ryce's case, in upholding the legality of these parole searches, the Supreme Court declined to base its analysis on the concept of consent or waiver. See *Samson*, 547 U.S. at 843 n.3 ("[W]e need not reach the issue whether 'acceptance of the search condition constituted a consent."); 547 U.S. at 863 n.4 (Stevens, J., dissenting) ("[T]he State's argument that a California parolee 'consents' to the suspicionless search condition is sophistry.").

Instead, the Court stated and held: "Examining the totality of the circumstances pertaining to petitioner's status as a parolee, 'an established variation on imprisonment,' [citation omitted], including the plain terms of the parole search condition, we conclude that petitioner did not have an expectation of privacy that society would recognize as legitimate." 547 U.S. at 852. In other words, there was no "search" within the meaning of the Fourth Amendment.

In contrast and as we have already discussed, both this court and the United States Supreme Court have recognized that testing blood to determine blood alcohol content "implicates an individual's 'most personal and deep-rooted expectations of privacy.'" *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1558. While a breath test is less invasive, it still "implicates similar concerns about bodily integrity." *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 617, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989). In other words, Kansas drivers do not have the same diminished expectation of privacy as did the parolees in *Samson*.

The United States Supreme Court later explained the importance of the reduced privacy interest to the *Samson* analysis, also

noting two other factors that were important to its outcome—actual notice (*i.e.*, not merely implied consent by virtue of a statute) of the State's right to conduct the search and the lack of discretion regarding the circumstances justifying a search. Specifically, in *Maryland v. King*, 569 U.S. ___, 133 S. Ct. 1958, 1970, 186 L. Ed. 2d 1 (2013), the Court explained the *Samson* analysis is rooted in "'traditional standards of reasonableness'" and requires a court to weigh "'the promotion of legitimate governmental interests' against 'the degree to which [the search] intrudes upon an individual's privacy.'" (Quoting *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S. Ct. 1297, 143 L. Ed. 2d 408 [1999].). Discussing *Samson* and other cases, the Court explained:

"In some circumstances, such as '[w]hen faced with special law enforcement needs, *diminished expectations of privacy*, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.' *Illinois v. McArthur*, 531 U.S. 326, 330, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001). Those circumstances diminish the need for a warrant, either because 'the public interest is such that neither a warrant nor probable cause is required,' *Maryland v. Buie*, 494 U.S. 325, 331, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990), *or because an individual is already on notice,* for instance because of his employment, see *Skinner, supra*, or *the conditions of his release from government custody*, see *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006), that some reasonable police intrusion on his privacy is to be expected. The need for a warrant is perhaps least *when the search involves no discretion* that could properly be limited by the 'interpo[lation of] a neutral magistrate between the citizen and the law enforcement officer.' *Treasury Employees v. Von Raab*, 489 U.S. 656, 667, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989)." (Emphases added.) *King*, 569 U.S. at ___, 133 S. Ct. at 1969-70.

In contrast, despite the implied consent provided for under 8-1001, drivers in Kansas do not have a diminished expectation of privacy, and they do not necessarily have express notice that they are impliedly consenting to testing by operating or attempting to operate a vehicle in Kansas (although 8-1001 requires law enforcement officers to give such a notice in seeking a driver's express consent). In addition, *McNeely* implicitly recognized the discretionary determinations an officer must make in order to decide if a search to test blood alcohol content is warranted by reaffirming that a neutral magistrate should review the circumstances in every case

where the law enforcement officer can reasonably obtain a warrant. Therefore, we conclude that *Samson* does not stand for the proposition that every motorist in Kansas provides an irrevocable implied consent to a search in exchange for the everyday privilege of operating or attempting to operate a vehicle. See *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1561, 1565.

Another circumstance discussed in *King* arises in a second case cited by the State, *Earls*, 536 U.S. 822—the special needs exception. In *Earls*, high school students challenged the constitutionality of a school's suspicionless urinalysis drug testing policy that required all students who participated in competitive extracurricular activities to submit to drug testing. The Court noted that "'special needs' inhere in the public school context." 536 U.S. at 829. As a result, "'Fourth Amendment rights . . . are different in public schools than elsewhere; the "reasonableness" inquiry cannot disregard the schools› custodial and tutelary responsibility for children.'" 536 U.S. at 829-30 (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 656, 115 S. Ct. 2386, 132 L. Ed. 2d 564 [1995]).

The Supreme Court explained the special needs exception in *Skinner*, 489 U.S. at 619. The Court outlined a two-step inquiry for determining whether the special needs exception applies: First, a court should determine whether "'"special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."'" 489 U.S. at 619 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S. Ct. 3164, 97 L. Ed. 2d 709 [1987]). Second, a court should balance the governmental and privacy interests at stake to determine whether a warrant should nonetheless be required. See *Skinner*, 489 U.S. at 619-20.

In *Skinner*, applying the two-prong test, the Supreme Court ruled that federal regulations requiring warrantless blood and urine searches of employees involved in some train accidents (and permitting warrantless tests for employees who violated certain safety rules) were constitutional. The Supreme Court explained that alcohol abuse was a recurrent problem in train operations. In addition, the Court stated:

"The Government's interest in regulating the conduct of railroad employees to ensure safety, like its supervision of probationers or regulated industries, or its

operation of a government office, school, or prison . . . 'presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.'" 489 U.S. at 620.

But the government's interest was not presented as one in criminal justice. Instead, the tests in *Skinner* were "special needs" because they were designed "not to assist in the prosecution of employees, but rather 'to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.'" 489 U.S. at 620-21.

When it came to balancing the government's needs against an individual's privacy interests, the Supreme Court concluded that seeking a warrant would likely frustrate the government's purpose in the search, which was to protect the public. Indeed, the delay in obtaining a warrant risked the destruction of evidence—an especially large risk in *Skinner* because it was up to railroads to arrange the tests and collect the samples, and railroad supervisors (1) were "not in the business of investigating violations of the criminal laws" and (2) were not expected to be familiar with warrant procedures. 489 U.S. at 623. Additionally, the circumstances permitting a warrantless blood search were so narrowly defined that there were virtually no facts for a neutral magistrate to evaluate. 489 U.S. at 622.

In contrast, the circumstances of DUI testing satisfy neither of the *Skinner* prongs. As to the first prong, nothing suggests the implied consent statute is designed for some need beyond those of normal law enforcement. "The [implied consent] statute was enacted to combat the increasing problem of drunk driving," and the primary purpose of an 8-1001 search is to collect evidence for a DUI prosecution. See *State v. Adee*, 241 Kan. 825, 831, 740 P.2d 611 (1987) ("'The very purpose of the implied consent law [8-1001] is to . . . coerce a motorist suspected of driving under the influence to "consent" to chemical testing, thereby allowing scientific evidence of his blood alcohol content to be used against him in a subsequent prosecution for that offense.'"); *State v. Bristor*, 236 Kan. 313, 319, 691 P.2d 1 (1984) ("The very purpose of the implied consent law is . . . to coerce . . . 'consent' to chemical testing, thereby allowing scientific evidence of [the suspect's] blood alcohol content to be used against him in a subsequent prosecution."). This

purpose is not "beyond the normal need for law enforcement." See *Skinner*, 489 U.S. at 619.

Protection of the public is certainly a corresponding purpose of the implied consent statute. The primary purpose of conducting a search under a DUI implied consent statute is a "general interest in crime control." See *Lynch v. City of New York*, 589 F.3d 94, 100 (2d Cir. 2009); *Fierro*, 853 N.W.2d at 242-43 ("The primary purpose of the warrantless seizure of [a DUI suspect's blood] was evidentiary and prosecutorial."). Significantly, the United States Supreme Court has declined to apply the special needs exception when "the immediate objective of the searches was to generate evidence for *law enforcement purposes." Ferguson v. Charleston*, 532 U.S. 67, 83-84, 121 S. Ct. 1281, 149 L. Ed. 2d 205 (2001).

With prosecution in mind and in light of *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013), the State cannot credibly claim that in the DUI context the warrant and probable cause requirement is categorically "impracticable." *McNeely* specifically instructs that "the general importance of the government's interest [in DUI cases] does not justify departing from the warrant requirement without showing exigent circumstances that make securing a warrant impractical in a particular case." 569 U.S. at ___, 133 S. Ct. at 1565-66. Although the *McNeely* Court was not discussing the special needs exception, the statement impacts the considerations for determining whether the exception applies to given circumstances. See *Skinner*, 489 U.S. at 619.

In considering the second prong of the special needs exception, the balancing stage, courts have particularly focused on the reasonableness of an individual's expectation of privacy. See *New York v. Burger*, 482 U.S. 691, 699-700, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987). In closely regulated industries with a long tradition of government supervision, the very nature of the work has significantly reduced an individual's or owner's expectation of privacy. 482 U.S. at 702-03. The State, citing to the extensive regulation of automobiles and driving, suggests the same applies here. But as we have noted, *McNeely* rejected this suggestion. *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1558 (quoting *Winston v. Lee*, 470 U.S. 753, 760, 105 S. Ct. 1611, 84 L. Ed. 2d 662 [1985]).

In addition, many of the other factors balanced in *Skinner* simply do not apply to an 81001 search. Unlike the situation in *Skinner*, (1) the law enforcement officers involved in a typical DUI case should certainly be familiar with warrant procedures; (2) technological advances have greatly reduced the time needed to obtain a warrant; and (3) the statute permits the police to request a chemical test if in the officers' opinion there is reasonable grounds for suspicion, a litmus test that is not so narrowly defined that there would be nothing for a neutral magistrate to evaluate. See *Skinner*, 489 U.S. at 622-23.

We thus conclude that the special needs exception does not apply to searches proposed under 8-1001. Thus, *Earls*, which applied the exception in the situation of a school district regulating participation in extracurricular activities, does not convince us a DUI implied consent is irrevocable in light of the caselaw establishing that (1) a warrant should be obtained before DUI testing whenever practicable and (2) for the consent exception to the warrant requirement to apply, the consent must be voluntary and can be withdrawn.

The final United States Supreme Court case cited by the State to support its argument that a DUI suspect's implied consent is irrevocable is *Zap*, 328 U.S. 624. In *Zap*, the Court recognized that a Navy contractor, "in order to obtain the government's business, specifically agreed to permit inspection" of his records, thereby waiving any claim to privacy in those records which he otherwise might have had. 328 U.S. at 628. The Court's holding in *Zap* was thus primarily focused on the existence of a "contractual agreement for inspection" of business records and on the fact the contractor had knowingly "waived" his rights pursuant to a "business undertaking for the government." 328 U.S. at 629-30. Despite the contractor's contemporaneous "protest" to the inspection, 328 U.S. at 627, the Court upheld the constitutionality of a search conducted with the cooperation of the contractor's employees, noting the agents "were lawfully on the premises. They obtained by lawful means access to the documents. That much at least was granted by the contractual agreement for inspection." 328 U.S. at 629.

The interest of the Navy as a party to a business transaction varies dramatically from the law enforcement interests of the government in a DUI investigation. And the privacy interests of all drivers who operate or attempt to operate a vehicle in Kansas vary dramatically from those of a contracting party to a business transaction. Moving beyond different interests at issue, the express and contractual consent to search involved in *Zap* differs from a widespread, categorical implied consent invoked by operation of 8-1001, a consent that may occur without knowledge one is granting permission to search. The distinction is explained in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

In *Schneckloth*, the United States Supreme Court discussed *Zap* as it explained its reasoning for rejecting a strict waiver standard as the test for determining whether the consent exception to the warrant requirement applied. Instead of a strict waiver standard, the Court adopted a standard requiring the State to "demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." 412 U.S. at 248. The Court repeatedly emphasized that "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." 412 U.S. at 233. Citing *Zap* and other consent cases, the Court noted they evidenced a "careful sifting of the unique facts and circumstances of each case." 412 U.S. at 233; *cf. McNeely*, 569 U.S. at ___, 133 S. Ct. at 1561 (holding "an exigency justifying a properly conducted warrantless blood test" must be decided on a case-by-case basis). In *Zap*, the unique facts showed a contract between a contractor and the government that expressly provided access to business accounts and records.

Implied consent is not an express contract. We do not read *Zap* to stand for the proposition that a DUI suspect irrevocably consents to a search based on the legislature's enactment of a statute that implies the consent of every person who operates or attempts to operate a vehicle in Kansas. See *State v. Won*, 136 Hawaii 292, 308, 361 P.3d 1195 (2015) (citing federal cases for support of holding that under the Hawaii Constitution implied consent cannot be irrevocable; "[C]onsent may not be predetermined by statute, but

rather it must be concluded that, under the totality of the circumstances, consent was in fact freely and voluntarily given."); *State v. Villarreal*, 2014 WL 6734178, at *12 (Tex. Crim. 2014) (holding that *Zap* did not "stand for the proposition that the government may exact from a citizen a generalized irrevocable waiver of Fourth Amendment rights in exchange for the enjoyment of everyday privileges, such as driving on the State's roadways"), *opinion on denial of rehearing* 475 S.W.3d 784, 801 (Tex. Crim. App. 2015).

In addition to *Samson, Earls,* and *Zap,* the State cites *State v. Bussart-Savoloja,* 40 Kan. App. 2d 916, 927-28, 198 P.3d 163 (2008), in which a panel of the Court of Appeals broadly stated a defendant has "no constitutional right to refuse to be tested." The *Bussart-Savoloja* court explained that Kansas' implied consent law was remedial and its purpose was to "coerce submission to chemical testing through the threat of statutory penalties such as license revocation." The court concluded that "a defendant's right to refuse consent in the context of driving under the influence is different from other areas." 40 Kan. App. 2d at 927-28. To support this conclusion, the court quoted from the United States Supreme Court decision in *South Dakota v. Neville,* 459 U.S. 553, 559, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983), and cited to a law journal article, Melilli, *The Consequences of Refusing Consent to A Search or Seizure: The Unfortunate Constitutionalization of an Evidentiary Issue,* 75 S. Cal. L. Rev. 901, 922 (2002). Neither supports the conclusion that there is no right to revoke an implied consent. See 40 Kan. App. 2d at 928.

Granted, statements in *Neville,* if taken out of context, support the Court of Appeals conclusion. For example, the *Neville* Court stated: "[A] person suspected of drunk driving has no constitutional right to refuse to take a blood-alcohol test." *Neville,* 459 U.S. at 560 n.10 (quoted in *Bussart-Savaloja,* 40 Kan. App. 2d at 928). Likewise, in the context of a due process discussion, the *Neville* Court stated that "Respondent's right to refuse the blood-alcohol test, by contrast, is simply a matter of grace bestowed by the South Dakota legislature." 459 U.S. at 565. Earlier in the *Neville* opinion, the Court had explained: "*Schmerber,* then, clearly allows a State to

force a person suspected of driving while intoxicated to submit to a blood alcohol test." 459 U.S. at 565 (citing *Schmerber v. California*, 384 U.S. 757, 767, 86 S. Ct. 1826, 16 L. Ed. 2d 908 [1966]). The Court then recognized that South Dakota had enacted a right to refuse in order "to avoid violent confrontations." 459 U.S. at 565.

But, as discussed in *McNeely*, *Schmerber* did not allow the State to compel a warrantless search in every case. And to read the *Neville* Court's statements to indicate some other categorical exception results in the type of overgeneralization the *McNeely* Court cautioned against when it said: "Circumstances may make obtaining a warrant impractical such that the alcohol's dissipation will support an exigency, but that is a reason to decide each case on its facts, as in *Schmerber*, not to accept the 'considerable overgeneralization' that a per se rule would reflect." *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1555. In addition, we feel constrained from reading *Neville* as a strong pronouncement on Fourth Amendment issues because the sole question before the *Neville* Court was whether admitting a DUI suspect's test refusal into evidence violated the Fifth Amendment. *Neville*, 459 U.S. at 554. The *McNeely* decision, a Fourth Amendment case, favorably cites *Neville* but only in the Fifth Amendment context. *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1566 (citing *Neville* as support for the statement that implied consent "laws impose significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution.").

The analysis by Professor Melilli in the law review article quoted by the *Bussart-Savoloja* Court of Appeals panel is more consistent with a post-*McNeely* view disfavoring categorical rules. The professor explained: "A search conducted upon probable cause *and a warrant (or some substitute for the requirement of a warrant)* is not an unreasonable search. There simply is no 'right' to avoid such a search." (Emphasis added.) 75 S. Cal. L. Rev. at 920. Although recognizing that consent would be one such exception, the author argued that the implied consent provided for in statutes such as

8-1001 could not satisfy the consent exception to the warrant requirement because, "[a]side from proceeding with the fundamental task of driving, the driver has done nothing that could be said to be a truly voluntary consent to a search." 75 S. Cal. L. Rev. at 920-21. Nevertheless, the author concluded: "These so-called 'implied consent' statutes pass constitutional muster under the Fourth Amendment" because they apply when there is "probable cause *and the exigency of dissipating blood-alcohol levels excusing the requirement of a warrant.*" (Emphasis added.) 75 S. Cal. L. Rev. at 921. If anything, the article supports Ryce's argument that—post-*McNeely*—there is a constitutional right to refuse to submit to a breath test requested on the basis of implied consent.

Indeed, most states hold that a test of bodily substances cannot depend on a Fourth Amendment consent exception to the warrant requirement if the suspect refuses to submit to testing. See, *e.g*; *People v. Harris*, 225 Cal. App. 4th Supp. 1, 8, 10, 170 Cal. Rptr. 3d 729 (2014) (reading *McNeely* to suggest that "refusal to submit to a chemical test under an implied consent law operates as a withdrawal of consent and renders any subsequent test nonconsensual" but deciding testing in that case was permitted on grounds that "there is nothing in the implied consent law to indicate that such measures are within the scope of the consent, and so in these cases the implied consent law gives way to the constitutional rules of *Schmerber* and its progeny"); *State v. Wulff*, 157 Idaho 416, 337 P.3d 575 (2014) ("[I]rrevocable implied consent operates as a per se rule that cannot fit under the consent exception because it does not always analyze the voluntariness of that consent."); *State v. Halseth*, 157 Idaho 643, 646, 339 P.3d 368 (2013) (holding right to withdraw consent is inherent in requirement that consent be voluntary); *State v. Brooks*, 838 N.W.2d 563, 569 (Minn. 2013) (stating that if someone refuses to comply with their previously implied consent, the police may not administer the test); *State v. Fierro*, 2014 SD 62, ¶ 23, 853 N.W.2d 235 (2014) (rejecting the argument that an implied consent statute permitted "compelled, warrantless blood draws in every case" because the statute, "by itself, does not provide an exception to the search warrant requirement").

We recognize Virginia has reached a contrary conclusion based on its caselaw holding that a driver's implied consent "is not 'qualified' or 'conditional'" and thus "allow[ing] it to be unilaterally withdrawn would 'virtually nullify the implied Consent Law.' [Citation omitted.]" *Rowley v. Commonwealth*, 48 Va. App. 181, 187, 629 S.E.2d 188 (2006) ("The act of driving constitutes an irrevocable, albeit implied, consent to the officer's demand for a breath sample."). But as we have discussed, our caselaw recognizes that a Kansas driver's consent is revocable, and, as we said in *State v. Edgar*, 296 Kan. 513, 294 P.3d 251 (2013), with regard to K.S.A. 2010 Supp. 8-1012, the right to revoke consent implied by 8-1001 rests on constitutional grounds.

Nothing the State has presented causes us to change course from our previous caselaw. It would be inconsistent with Fourth Amendment principles to conclude consent remained voluntary if a suspect clearly and unequivocally revoked consent. Thus, we conclude the Fourth Amendment principles recognize that a consent implied through 8-1001 can be withdrawn. See *Won*, 136 Hawaii at 308.

In sum, when an officer requests a search based solely on having deemed that the driver had impliedly consented to the search, the driver has a right grounded in the Fourth Amendment to refuse to submit. And, as previously noted, K.S.A. 2014 Supp. 8-1025 does not apply to any proposed search other than one "deemed consented to." K.S.A. 2014 Supp. 8-1025 does not reach as far as the State or the dissent assert.

Nevertheless, the Fourth Amendment does not *explicitly* protect drivers like Ryce from criminal penalties under 8-1025 when no search actually occurs—by not searching, officers are actually respecting the assertion of the Fourth Amendment. Likewise, the issue in this case is not whether 8-1025 subjects Ryce or others to an unreasonable search or seizure but whether its criminalization of Ryce's refusal is constitutionally permissible.

Even though the text of the Fourth Amendment does not explicitly cover the situation in this case because no search occurred, Ryce argues he is entitled to a remedy under the Fourth Amendment. Alternatively, he suggests a remedy could be granted under

the Due Process Clause of the Fourteenth Amendment. The State counters by citing our caselaw upholding 8-1001 when considering a due process challenge and the caselaw of other states finding that criminal refusal statutes do not violate due process. We thus now turn to the root issue in Ryce's case.

6. *Can the State constitutionally punish a person for withdrawing consent?*

We first consider whether the Fourth Amendment protections, by themselves, prohibit a state from punishing a person for withdrawing consent. Because we determine it does not, we will then turn to the parties' due process arguments.

6.1. *Is a Fourth Amendment remedy appropriate?*

Two United States Supreme Court cases suggest that whether a state may criminally penalize Ryce's refusal to submit to an unreasonable search may be resolved through the Fourth Amendment: *See v. City of Seattle*, 387 U.S. 541, 546, 87 S. Ct. 1737, 18 L. Ed. 2d 943 (1967), and *Camara v. Municipal Court*, 387 U.S. 523, 540, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). Both were Fourth Amendment cases, and both end with compelling language. In *See*, the Court stated: "[A]ppellant may not be prosecuted for exercising his constitutional right to insist that the fire inspector obtain a warrant authorizing entry upon appellant's locked warehouse." *See*, 387 U.S. at 546. Similarly, in *Camara*, the Court stated:

"Assuming the facts to be as the parties have alleged, we therefore conclude that *appellant had a constitutional right to insist that the inspectors obtain a warrant to search and that appellant may not constitutionally be convicted for refusing to consent to the inspection.*" (Emphasis added.) 387 U.S. at 540.

A few years later, discussing *See* and *Camara*, the Court summarized these holdings, stating: "In each case a majority of this Court held that the Fourth Amendment barred prosecution for refusal to permit the desired warrantless inspection." *Wyman v. James*, 400 U.S. 309, 324-25, 91 S. Ct. 381, 27 L. Ed. 2d 408 (1971).

At first glance, these cases support Ryce's reliance on the Fourth Amendment. But closer examination leads to the opposite conclusion.

In both *See* and *Camara*, the United States Supreme Court was faced with a statute that expressly authorized a warrantless search. See *See*, 387 U.S. at 541; *Camara*, 387 U.S. at 526. The focus of the Court's inquiry was whether the statute permitting the search in the first place—not the criminal penalty provision—was constitutional. In fact, discussions of the criminal penalty provisions themselves were relegated to footnotes. And since the Court found the search-authorizing statutes unconstitutional, the related convictions under a general statute prohibiting "resist[ing] . . . the execution» of the search-authorizing statute could not stand. *Camara*, 387 U.S. at 527 n.2, 534; see also *See*, 387 U.S. at 542 n.1, 545-46.

Unlike the statutes at issue in *See* and *Camara*, the statute challenged in Ryce's case—8-1025—does not authorize a search but instead imposes criminal penalties if a suspect refuses to permit a search deemed consented to under 8-1001. We are not here concerned with whether any provision of 8-1001, the search-authorizing and implied consent statute, is constitutional. Rather, our concern focuses on whether, when the police request a search deemed consented to under 8-1001, the State may *criminalize* a suspect's refusal.

Second, even if *See* and *Camara* are not distinguishable on this basis, we question the validity of relying solely on the Fourth Amendment, absent any search, in light of the subsequent decision in *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). In that case, parents of a motorcycle passenger killed in a high-speed chase brought a claim. The parents alleged their child was deprived of his right to life in violation of substantive due process when sheriff's officers deliberately and recklessly violated a sheriff's department order regulating high-speed pursuits. In defense, the county argued the substantive due process claim under the Fourteenth Amendment should be dismissed because Fourth Amendment principles regarding the reasonableness of a seizure applied. The Supreme Court rejected that argument.

In its analysis, the Court first noted its reluctance to "'expand the concept of substantive due process.'" 523 U.S. at 842 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 117

L. Ed. 2d 261 [1992]). Indeed, "'[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Lewis*, 523 U.S. at 842 (quoting *Albright v. Oliver*, 510 U.S. 266, 273, 114 S. Ct. 807, 127 L. Ed. 2d 114 [1994]); see also *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Still, the Court concluded the Fourth Amendment did not provide an explicit textual source for the protection sought because it "covers only 'searches and seizures,' neither of which took place here." *Lewis*, 523 U.S. at 843.

We face similar relevant facts here, and the same conclusion applies. Although Ryce was seized, his seizure is not the source of his complaint. And he was not searched. Rather, his claim rests on rights *flowing* from the Fourth Amendment.

The *Lewis* Court also cautioned against bringing new rights under the penumbra of substantive due process. 523 U.S. at 842-43. But this concern does not prevent application of a due process analysis in this case because the Fourth Amendment right to be free from unreasonable searches and seizures—a right Ryce exercised by withdrawing his implied consent and refusing to expressly consent to testing—is deeply rooted in our history and is "implicit in the concept of ordered liberty." See *Washington v. Glucksberg*, 521 U.S. 702, 720-21, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) (recognizing the Fourth Amendment right to refuse to consent); see also *Planned Parenthood of Southeastern PA v. Casey*, 505 U.S. 833, 847, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) ("The most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights.").

We are thus satisfied that the Supreme Court's expressed reluctance to expand the concept of substantive due process does not prevent a substantive due process analysis in this case. But that does not answer the question of how, if at all, the Due Process Clause applies to Ryce's claim.

6.2. *What protection does the Due Process Clause provide Ryce?*

The Due Process Clause of the United States Constitution prohibits a state from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. "[F]reedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.'" *Kansas v. Hendricks*, 521 U.S. 346, 356, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 [1992]). K.S.A. 2014 Supp. 8-1025(b) clearly imposes restraints on freedom because it sets out graduated sentencing severity levels for refusing to submit to a test, and all levels require some term of imprisonment. Because 8-1025 results in a deprivation of liberty, the Due Process Clause "imposes procedural and substantive due process requirements." *State v. Hall*, 287 Kan. 139, 142-43, 195 P.3d 220 (2008). In this appeal, neither party raises a procedural due process claim. Consequently, we focus on substantive due process.

Our starting point requires us to recognize that "the Constitution does not forbid 'every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights.'" *Jenkins v. Anderson*, 447 U.S. 231, 236, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980) (quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 30, 93 S. Ct. 1977, 36 L. Ed. 2d 714 [1978]). The United States Supreme Court has recognized a framework of tests used to determine which statutorily imposed choices violate substantive due process protections. Under these tests, we must first determine which of three levels of scrutiny apply to our review of 8-1025. See *State v. Voyles*, 284 Kan. 239, 258, 160 P.3d 794 (2007).

6.3. *What level of scrutiny applies?*

The highest level of scrutiny, "strict scrutiny," applies to judicial review of statutes implicating fundamental rights guaranteed by the Constitution. An intermediate level of judicial review, "heightened scrutiny," applies in situations presenting discrimination based on gender or illegitimacy. Finally, the lowest level of judicial scrutiny, the "rational basis" test, applies in all other situations. See *Voyles*,

284 Kan. at 258. No party suggests the intermediate level of scrutiny applies in this case, nor do we. But the parties disagree on which of the other two standards applies.

The State relies on cases that impose the lowest level of review—the rational basis test—when considering the constitutionality of an implied consent or a test refusal statute. In fact, the State emphasizes that this court has repeatedly upheld the constitutionality of 8-1001 even when recognizing the coercive aspects of implying consent in exchange for a license to drive. *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 635, 176 P.3d 938 (2008), *abrogated on other grounds by City of Atwood v. Pianalto*, 301 Kan. 1008, 1011-13, 350 P.3d 1048 (2015); *Furthmyer v. Kansas Dept. of Revenue*, 256 Kan. 825, 835, 888 P.2d 832 (1995); *Standish v. Department of Revenue*, 235 Kan. 900, 904, 683 P.2d 1276 (1984); *Popp v. Motor Vehicle Department*, 211 Kan. 763, 766, 508 P.2d 991 (1973).

The Kansas cases cited in support of the State's argument dealt with challenges regarding the procedure for administratively revoking drivers' licenses because of a test refusal. In such procedural due process situations we have recognized that "limited due process applies." *Martin*, 285 Kan. at 632. This was further explained in *Barnes v. Kansas Dept. of Revenue*, 238 Kan. 820, 824, 714 P.2d 975 (1986), where we cited to two decisions of the United States Supreme Court discussing procedural due process in the context of driver's license revocations: *Mackey v. Montrym*, 443 U.S. 1, 99 S. Ct. 2612, 61 L. Ed. 2d 321 (1979), and *Dixon v. Love*, 431 U.S. 105, 97 S. Ct. 1723, 52 L. Ed. 2d 172 (1977). As recognized in those cases, a different test applies in the procedural as opposed to substantive due process context. In a procedural due process context, courts apply the so-called *Eldridge* criteria or factors. See *Mackey*, 443 U.S. at 10-11; *Dixon*, 431 U.S. at 112-13; see also *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (identifying three factors: [1] "the private interest that will be affected by the official action"; [2] "the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional or substitute procedural safeguards"; and [3] "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.").

The Kansas cases regarding procedural due process attacks on 8-1001 are also distinguished because they recognize that driver's licenses are a *privilege*, not a right. See *Martin*, 285 Kan. 625 (collecting cases). Here, Ryce asserts his *right* to be free from an unreasonable search. The procedural due process cases cited by the State provide some guidance, however, in that they discuss the State's interest in controlling drunk drivers. And while those recognized interests are relevant to an analysis of substantive due process—regardless of whether we apply a rational basis or strict scrutiny standard—the cases are otherwise not applicable. They do not address substantive due process issues and provide no guidance as to the standard of scrutiny applicable in this case. Nor do they answer or affect the question before us regarding 8-1025, which imposes a criminal penalty that deprives a person of liberty.

The State also relies on decisions by the Minnesota appellate courts and the North Dakota Supreme Court that apply the rational basis test when analyzing the constitutionality of those states' criminal refusal statutes. In the most recent of these opinions, *State v. Bernard*, 859 N.W.2d 762 (Minn. 2015), *cert. granted* 136 S. Ct. 615 (2015), the Minnesota Supreme Court first reasoned the search incident to arrest exception categorically justifies a warrantless search of drivers' breath through a chemical test. 859 N.W.2d at 767-68. Because the search complied with the Fourth Amendment, the court determined that the driver did not have a fundamental right to refuse the constitutional search. Applying the lowest level of scrutiny, the court held the statute did not offend due process, stating: "[I]t is rational to conclude that criminalizing the refusal to submit to a breath test relates to the State's ability to prosecute drunk drivers and keep Minnesota roads safe." 859 N.W.2d at 774.

We do not find this reasoning persuasive for several reasons. First, the Minnesota Supreme Court examined whether any warrant exception justified a search, in which case a driver would not have the right to refuse to submit to the testing. But the Minnesota court filed its decision several months before *Patel* was decided. After *Patel*, we begin our inquiry into facial unconstitutionality with the plain language of 8-1025, which criminalizes a refusal to

complete a test justified on the basis of implied consent, rather than being justified on a warrant exception other than consent. With the benefit of *Patel* and its instruction to limit a facial constitutionality consideration to the language of the statute as opposed to other grounds that might make a search constitutional, we reject even potential categorical reliance on the search incident to arrest exception.

Second, even if we took the broader approach adopted by the Minnesota court, we disagree with the analysis. As we have discussed, we read the United States Supreme Court's decision in *Schmerber* to indicate the search incident to arrest exception does not categorically allow warrantless testing in DUI cases. See *Schmerber v. California*, 384 U.S. 757, 768-70, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966) (declining to extend search incident to arrest exception wholesale to DUI-type cases because officer safety and destruction of evidence considerations had "little applicability with respect to searches involving intrusions beyond the body's surface"); see also *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552, 1565, 185 L. Ed. 2d 696 (2013) (discussing *Schmerber* and emphasizing need for warrant unless totality of circumstances justified application of the evanescent evidence exception). The *Bernard* majority reaches its conclusion by distinguishing between testing of blood, which requires penetrating the body's surface, and breath and other testing that does not. However, based on *Schmerber's* discussion that breath and urine testing also implicated significant personal privacy concerns and its determination that neither officer safety nor destruction of evidence justifies the application of the exception, we disagree with the *Bernard* court's decision. We view the *Bernard* dissent's analysis of the exception, and its ultimate conclusion that it does not apply, as far more sound. See generally *Bernard*, 859 N.W.2d at 774-79 (Page and Stras, JJ., dissenting); *Williams v. State*, 167 So. 3d 483, 491-92 (Fla. Dist. App. 2015) (rejecting the *Bernard* majority opinion).

Consequently, we do not find the *Bernard* majority's reasoning or its decision to use the rational basis test persuasive. The revocation of implied consent is the exercise of a fundamental Fourth Amendment right.

Interestingly, the Minnesota Supreme Court did not cite or adopt the reasoning of the Minnesota Court of Appeals unpublished decision in *State v. Chasingbear*, No. A14-0301, 2014 WL 3802616 (Minn. App. 2014) (unpublished opinion), which the State asks us to follow. The State's reliance parallels the path of other courts because *Chasingbear* has been relied upon by other courts. See, *e.g.*, *United States v. Sugiyama*, 113 F. Supp. 3d 784, (D. Md. 2015); *State v. Birchfield*, 2015 ND 6, 858 N.W.2d 302 (2015), *cert. granted* 136 S. Ct. 614 (2015). Regardless of what the Minnesota Supreme Court felt about the *Chasingbear* rationale, our review persuades us we should not adopt it for a variety of reasons.

First, the *Chasingbear* court recognized a "legal paradox" created by (1) holding that a DUI suspect has no right to refuse to be tested, while at the same time, (2) holding that the suspect "retains the constitutional right not to actually be tested without a warrant or a valid warrant exception." In the end the court concluded that "[t]he somewhat competing notions may be difficult to comprehend using linear reasoning, but . . . [l]egal paradoxes exist and make some constitutional anomalies challenging, if not perplexing, but they do not render them wrong or illogical." *Chasingbear*, 2014 WL 3802616, at *6. The court thus seems to have concluded that just because no one understands how a refusal statute can be constitutional does not mean it is necessarily unconstitutional. We find this wholly unsatisfying and at odds with the fundamental principles of the Fourth Amendment and the liberty interest protected by the Due Process Clause.

Second, the *Chasingbear* court narrowly defined the right at issue, describing it as the "right to refuse to provide a breath sample to reveal the precise quantity of alcohol in [a person's body]." 2014 WL 3802616, at *10. So defined, the *Chasingbear* defendant had no fundamental right at stake, since the specific right to refuse to submit to chemical testing involved a modern situation not deeply rooted in national history and tradition. *Cf. Downtown Bar and Grill v. State*, 294 Kan. 188, 194, 273 P.3d 709 (2012) (explaining that if a nonfundamental right is at issue, the substantive due process rational basis test, as opposed to strict scrutiny, applies). We think this conclusion is incorrect.

Rhetorically, this approach could render the Fourth Amendment practically meaningless in modern society because the State could specifically criminalize the refusal to submit to a search of almost anything. Then, by narrowly defining the Fourth Amendment right at stake to include only the particular object of the State's search, the State could avoid substantive due process issues by claiming the right at stake was not deeply rooted in our history. *Cf. Riley v. California*, 573 U.S. ___, 134 S. Ct. 2473, 2484, 189 L. Ed. 2d 430 (2014) (deciding how the search incident to arrest doctrine applies to modern cell phones, which the Court noted "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy. A smart phone of the sort taken from [the defendant] was unheard of ten years ago."). Notably, *McNeely* did not define the right at stake so narrowly. *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1561 ("In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so.").

Third, the cases cited by *Chasingbear* for support are not convincing. The *Chasingbear* court seems to have reached its due process conclusion largely because of *South Dakota v. Neville*, 459 U.S. 553, 559, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983), in which the United States Supreme Court stated that a suspect has no right to refuse an alcohol test. But, as we have already discussed, *Neville* actually considered whether a defendant had a *Fifth* Amendment right to refuse a chemical test on the grounds of self-incrimination, and the Court determined no such right occurred. See *Neville*, 459 U.S. at 554-56. Here, we have determined that a fundamental right guaranteed by the Fourth Amendment is at stake.

A recent case from the North Dakota Supreme Court, which extensively discussed *Chasingbear* and mentioned many other Minnesota cases, is similarly unpersuasive. *Birchfield*, 2015 ND 6. The North Dakota Supreme Court first stressed that "the *McNeely* Court referred to acceptable 'legal tools' with 'significant consequences' for refusing to submit to testing." 2015 ND 6, at ¶ 13. While this is true, *McNeely* does not endorse the use of criminal

penalties for test refusal. The plurality opinion only referred to two consequences, stating: "[T]ypically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a [blood alcohol] test to be used as evidence against him in a subsequent criminal prosecution." See *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1566 (plurality opinion). Conspicuously missing from that description of "significant consequences" is the criminalization of a refusal to submit to testing. We decline to speculate as to why, but in any event, *McNeely* cannot be read to have considered statutes like 8-1025 and to have approved of them—that simply was not the issue before the *McNeely* Court.

Then, the North Dakota court considered the general reasonableness of the test refusal statute. We discussed this test in the context of the State's reliance on *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006), and *Board of Ed. of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 122 S. Ct. 2559, 153 L. Ed. 2d 735 (2002). As we noted, general reasonableness applies in limited circumstances, such as "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like." *Illinois v. McArthur*, 531 U.S. 326, 330, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001). This is not a case involving special law enforcement needs. Nor, as stated in *McNeely*, is there a diminished expectation of privacy. And the intrusion for testing of bodily substances is not minimal. *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1558 (quoting *Winston v. Lee*, 470 U.S. 753, 760, 105 S. Ct. 1611, 84 L. Ed. 2d 662 [1985]).

Moreover, the United States Supreme Court has often repeated that in a criminal context searches conducted without a warrant "'"are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions."'" *Los Angeles v. Patel*, 576 U.S. ___, 135 S. Ct. 2443, 2452, 192 L. Ed. 2d 435 (2015) (quoting *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 [2009]; *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 [1967]). General reasonableness—untethered from the special needs exception—is not a recognized warrant exception in a criminal context. See *United States v. Bute*, 43 F.3d 531, 534-35 (10th Cir. 1994) ("[P]recedent neither establishes

nor condones application of an amorphous 'reasonableness' test to determine the constitutionality of a warrantless search."); *State v. Baughman*, 29 Kan. App. 2d 812, 815, 32 P.3d 199 (2001) ("[W]e think it wise to avoid 'the wild card of general reasonableness' as the rationale for our decisions in Fourth Amendment cases.'").

In summary, none of the cases cited by the State convince us Ryce has asserted a nonfundamental right. We find more persuasive the decision in *State v. Trahan*, 870 N.W.2d 396 (Minn. App. 2015), a recent case from Minnesota that suggests a fundamental right is at issue.

In *Trahan*, the Minnesota Court of Appeals considered the impact of *Bernard* when a defendant challenged Minnesota's criminal test refusal statute after being convicted because he refused to cooperate with a blood test. The court distinguished the breath test at issue in *Bernard* because, "[u]nlike breath, blood does not naturally and regularly exit the body." 870 N.W.2d at 401. Specific to blood tests, relying on *Schmerber v. California*, 384 U.S. 757, 769, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), the court concluded the search incident to arrest exception did not categorically apply. 870 N.W.2d at 401-02. The court also held that the facts of the case did not present exigent circumstances. 870 N.W.2d at 403. Turning to a due process analysis, the court concluded strict scrutiny should be applied to an analysis of whether the defendant had been denied due process analysis "[b]ecause a warrantless search of Trahan's blood would have been unconstitutional under these circumstances, Trahan's fundamental right to be free from unreasonable searches is implicated." *Trahan*, 870 N.W.2d at 404.

We agree with the conclusion in *Trahan*, although we do not limit it to blood searches and apply it to breath searches as well. Without question, the Fourth Amendment freedom from unreasonable searches is a freedom protected by the Bill of Rights—it is a fundamental right. See *Gouled v. United States*, 255 U.S. 298, 303-04, 41 S. Ct. 261, 65 L. Ed. 647 (1921) (discussing Fourth and Fifth Amendments: "[S]uch rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty and private property'; . . . they are to be regarded as of the very essence of constitutional liberty."), *overruled on other grounds War-den v. Hayden*, 387 U.S. 294, 306, 87 S. Ct. 1642, 18 L. Ed. 2d 782

(1967); *Ker v. California,* 374 U.S. 23, 32, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963) ("Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of individual freedom. That safeguard has been declared to be 'as of the very essence of constitutional liberty' the guaranty of which 'is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen.'").

In adopting 8-1025, the legislature respected, at least textually, the Fourth Amendment—the statute does not authorize searches. But the statute infringes on the right to be free from an unreasonable search and chills assertion of the Fourth Amendment. In fact, 8-1025 does more than chill the exercise of Fourth Amendment rights; it specifically punishes the assertion of the right to a reasonable search as guaranteed by the Fourth Amendment.

"To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.' [Citation omitted.]" *United States v. Goodwin,* 457 U.S. 368, 372, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982). In *Goodwin,* the United States Supreme Court explained that "while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right." 457 U.S. at 371-72 (holding prosecutors cannot vindictively enhance charges after a defendant had successfully asserted the right to a jury trial); see *United States v. Jackson,* 390 U.S. 570, 581-82, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968) (declaring due process violation when statute made capital convictions available only to defendants who exercised their right to a jury trial, noting: "If the provision had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional."); *United States v. Robel,* 389 U.S. 258, 264-65, 88 S. Ct. 419, 19 L. Ed. 2d 508 (1967) (declaring unconstitutional a statute that limited individuals' ability to work at defense facilities if they were registered with communist organizations because it "put appellee to the choice of surrendering his organizational affiliation, regardless of whether his membership threatened the security of a defense facility, or giving up his job" and failed the "axiomatic" principle "that '[p]recision

of regulation must be the touchstone in an area so closely touching our most precious freedoms'").

K.S.A. 2014 Supp. 8-1025 relates to 8-1001, which creates a procedure for a search based on consent, and punishes an individual for withdrawing his or her consent even though the right to withdraw consent is a corollary to the United States Supreme Court's requirement that a consent to search must be free and voluntary in order for the resulting search to be reasonable under the Fourth Amendment. See *State of Hawaii v. Won*, 136 Hawaii 292, 361 P.3d 1195 (2015). And the Fourth Amendment provides a fundamental right to be free from an unreasonable search. See *Trahan*, 870 N.W.2d at 404 ("Because a warrantless search of Trahan's blood would have been unconstitutional under these circumstances, Trahan's fundamental right to be free from unreasonable searches is implicated.). But see *State v. Bernard*, 859 N.W.2d 762 (Minn. 2015), *cert. granted* 136 S. Ct. 615 (2015) ("Having decided that the search of Bernard's breath would have been constitutional, we find no fundamental right at issue here, as Bernard does not have a fundamental right to refuse a constitutional search.").

Because a fundamental right is involved we apply strict scrutiny.

### 6.4. *Does 8-1025 serve a compelling interest?*

Under the strict scrutiny test, the State may prevail even when significantly encroaching upon personal liberty if it can show "'a subordinating interest which is compelling'" and that the infringement on a fundamental liberty interest is "narrowly tailored to serve" that interest. *N.A.A.C.P. v. Button*, 371 U.S. 415, 438-39, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963) (quoting *Bates v. Little Rock*, 361 U.S. 516, 524, 80 S. Ct. 412, 4 L. Ed. 2d 480 [1960]); *Reno*, 507 U.S. at 302; *In re Care & Treatment of Hay*, 263 Kan. 822, 831-33, 953 P.2d 666 (1998). In this context, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Button*, 371 U.S. at 437-38.

Our first task, therefore, is to determine whether a compelling interest justifies the criminalization of a driver's refusal to submit to blood alcohol testing. In an effort to determine the State's interest in criminalizing a test refusal, we reviewed the legislative history

surrounding 8-1025. It reveals that, in 2009, the Kansas Legislature created the Kansas DUI Commission and charged it with reviewing DUI statutes in Kansas and other states. The stated goals, as relevant to 8-1025, were to "assure highway safety by changing behavior by DUI offenders as early as possible[] and provide significant restrictions on personal liberty at some level of frequency and quantity of offenses." Supplemental Note on Substitute for Senate Bill No. 7. Among other recommendations, the commission proposed a test refusal statute.

The minutes and record of written testimony before the legislative committees reflect more specific reasons for seeking the adoption of 8-1025, including: (1) to deter test refusals because refusals allow offenders to evade prosecution and punishment, which means no addiction evaluation occurs, no treatment can be ordered, and the offender is not deterred from reoffending; (2) to hold DUI offenders accountable; and (3) to reduce the resources currently expended in order to prosecute DUI cases where a defendant refused testing. See Minutes, Senate Judiciary Committee, January 26-28, 2011, and March 9, 2012.

In addition, we must consider the interest we have previously recognized relating to Kansas' DUI statutes. Primarily, we have repeatedly noted the State's compelling overall interests in both combating and penalizing drunk driving and in protecting public safety on the roads. See *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1565; *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 635, 176 P.3d 938 (2008). As we have discussed, this interest is sufficiently compelling to allow some encroachment on Fourth Amendment rights in the DUI context, at least to the extent we have approved the use of civil penalties such as suspension of driving privileges to encourage a suspect to provide actual, contemporaneous consent to a chemical test for alcohol. See *McNeely*, 569 U.S. at ___, 133 S. Ct. at 1566-67; *Martin*, 285 Kan. at 635. We have done so because of the magnitude of the drunk driving problem and because the State has the ability to regulate who may drive on the road. See, *e.g.*, *Martin*, 285 Kan. at 632-33; *State v. Mertz*, 258 Kan. 745, 761, 907 P.2d 847 (1995) ("A sanction which revokes a privilege is a remedial sanction, not a punitive sanction."); see also *McNeely*,

569 U.S. at ___, 133 S. Ct. at 1566 (plurality opinion) (recognizing license revocation as a tool to coerce submission to a blood draw).

In addition, we have noted that testing "eliminate[s] mistakes from objective observation alone" in that it "disclose[s] the truth" when a driver denies drinking and "protect[s]" the person who smells of alcohol or exhibits physical clues of intoxication but is not. *State v. Garner*, 227 Kan. 566, 571, 608 P.2d 1321 (1980). We also recognize that encouraging cooperation in testing helps protect the safety of law enforcement officers and, if involved, medical personnel. See, *e.g., State v. Adee*, 241 Kan. 825, 831, 740 P.2d 611 (1987); *State v. Bristor*, 236 Kan. 313, 319, 691 P.2d 1 (1984).

Thus the State's interest in adopting 8-1025 can be categorized as: (1) criminal justice interests—deterring test refusals, deterring recidivism, holding offenders accountable, and reducing the difficulties in prosecution and potential evasion of prosecution altogether; (2) encouraging public safety; and (3) protecting the safety of those who deal with the suspect and perform the test. We do not dispute that these interests are compelling. Consequently, we next must determine whether 8-1025 is narrowly tailored to serve those interests, and we consider each interest in turn.

6.5. *Is 8-1025 narrowly tailored to serve the criminal justice interests?*

When considering the criminal justice interests, we find it significant that the *McNeely* Court, after recognizing that "[n]o one can seriously dispute the magnitude of the drunken driving problem," reiterated "the general importance of the government's interest in this area does not justify departing from the warrant requirement without showing exigent circumstances that make securing a warrant impractical in a particular case." 569 U.S. at ___, 133 S. Ct. at 1565 (plurality opinion). Given the availability of a warrant, we question whether 8-1025 is narrowly tailored.

The impact of the warrant tool is significant. With regard to the State's interest in reducing test refusals, according to the *McNeely* Court, "field studies in States that permit nonconsensual blood testing pursuant to a warrant have suggested that, although warrants do impose administrative burdens, their use can reduce

breath-test-refusal rates and improve law enforcement's ability to recover BAC evidence." 569 U.S. at ___, 133 S. Ct. at 1567 (plurality opinion).

In other words, the constitutionally approved tool is capable of achieving the same goals as those targeted by the test refusal statute. But Kansas has sometimes elected to avoid use of the Fourth Amendment warrant tool; for example, the legislature limited an officer's ability to obtain a search warrant compelling a blood sample after a defendant refused testing. Compare *Adee*, 241 Kan. at 829-33 (holding pre-2008 version of the implied consent statute prohibited an officer from obtaining a search warrant to compel a blood sample after a defendant refused testing), and *Hoeffner v. Kansas Dept. of Revenue*, 50 Kan. App. 2d 878, 335 P.3d 684 (2014) (holding K.S.A. 2011 Supp. 8-1001 retained the prohibition) with *City of Dodge City v. Webb*, 50 Kan. App. 2d 393, Syl. ¶ 4, 329 P.3d 515 (2014) (holding law enforcement personnel are statutorily entitled under the Kansas implied consent law to obtain a warrant to draw blood from a driver even after the driver refuses to submit to a breathalyzer test), *rev. granted* 302 Kan. 1008 (2015).

We need not decide today whether that limit applied to Ryce because, either way, 8-1025 is not narrowly tailored. If the legislature statutorily restricted the use of a warrant, thereby removing this tool from the State's toolbox, it cannot then punish a driver who refuses to consent to a warrantless search on the notion that otherwise the driver will be able to avoid accountability. Alternatively, if a warrant was available, the State could have served all its criminal justice purposes without punishing Ryce's exercise of a constitutional right. It could have (1) held Ryce accountable for driving while intoxicated, (2) deterred his refusals by legitimately threatening a warrant search, (3) reduced costs of prosecution by obtaining a warrant, searching, and finding evidence, and (4) if Ryce failed to comply with the warrant, the State could charge him with interference with law enforcement under K.S.A. 2014 Supp. 21-5904(a)(3). Simply put, the legislature did not narrowly and precisely draw 8-1025 when it chose to criminally punish an individual for exercising his or her Fourth Amendment rights.

Granted, it would no doubt be easier to prosecute DUI cases without the need to obtain a warrant, especially since test refusal carries penalties equal to that of drunk driving. But the warrant requirement is "not merely 'an inconvenience to be somehow "weighed" against the claims of police efficiency.'" *Riley v. California*, 573 U.S. ___, 134 S. Ct. 2473, 2493, 189 L. Ed. 2d 430 (2014); see also *Martin*, 285 Kan. at 647-48 (Rosen, J., dissenting) ("I am extremely mindful of the paramount public objective of removing intoxicated drivers from our public roads and highways; however, achievement of this goal should not be at the expense of the protections guaranteed by our Constitution.").

We recognize there will be circumstances when a warrant cannot be timely obtained. But in those circumstances, exigent circumstances and the evanescent nature of the evidence may justify a warrantless search, as explained in *McNeely*. Or it might be that the specific circumstances of a case would give rise to a warrant exception other than exigent circumstances. The tools available to the State under the Fourth Amendment remain perfectly suited and capable of accomplishing the same ends as 8-1025.

The State could theoretically tailor a refusal penalty statute to apply to those specific situations where a search would be constitutional under the Fourth Amendment. And it could provide for graduated penalties that match or exceed the penalties for DUI offenses. Such a statute would more narrowly fit the longstanding caselaw in which this court has relied on warrant exceptions other than consent. While our task is not to evaluate the best options for a statute to achieve the State's goals, this discussion illustrates that the method the State has chosen—8-1025—is not precisely and narrowly tailored so as to avoid interfering with a fundamental right.

In essence, through the use of a warrant and through statutes that are narrowly tailored to fit the permissible grounds for search, including narrowly tailored criminal refusal statutes, the State can encourage drivers to expressly consent to testing and achieve all of its interests related to increasing cooperation with the testing process. See *Burnett v. Municipality of Anchorage*, 806 F.2d 1447, 1450 (9th Cir. 1986) (distinguishing between refusal to submit and

refusal to consent and viewing distinction as meaningful in large part because consent was irrelevant given that the chemical tests qualified for the search incident to lawful arrest or exigent circumstances exception); *People v. Harris*, 225 Cal. App. 4th Supp. 1, 5, 10 Cal. Rptr. 3d 729 (2014) (same); *State v. Hill*, No. 2008-CA-0011, 2009 WL 1485026, at *4 (Ohio App. 2009) (unpublished opinion) (same).

### 6.6. *Is 8-1025 narrowly tailored to serve public safety?*

In addition, the criminal refusal penalty is not narrowly tailored to achieve the State's compelling interest in promoting safety on the roads. We reach this conclusion for several reasons. First, civil penalties for refusal mean the obstinate driver loses his or her license—thus (hopefully) keeping that driver off the road. While Ryce's case shows that not all drivers without licenses will refrain from driving, the State may theoretically seek a warrant for an alcohol test and enact criminal penalties, including jail time, for refusing to submit to a valid Fourth Amendment search. The State could both protect constitutional rights and public safety—we do not find the DUI problem as presenting the State with the need for an "either/or" solution. *State v. Brown*, 245 Kan. 604, 612-13, 783 P.2d 1278 (1989) (explaining that if an "officer states that a search warrant can be obtained and, in fact, there are grounds for the issuance of a warrant, the statement is correct and does not constitute coercion). As the Minnesota Court of Appeals held:

"We recognize that the available alternatives may not be as efficient as the current procedure under the test-refusal statute. But these alternatives serve the state's compelling interest in securing the safety of its roadways without infringing on a driver's fundamental right to refuse an unreasonable search of his blood." *State v. Trahan*, 870 N.W.2d 396, 404 (Minn. App. 2015) (holding criminal refusal statute as applied did not meet strict scrutiny and violated driver's due process rights).

### 6.7. *Is 8-1025 narrowly tailored to protect the safety of testing personnel?*

The compelling interest in avoiding the need to physically force someone to submit to a blood draw, which implicates the safety of the suspect, the officers, and the medical staff, is paramount.

But the civil penalties for refusing a test already coerce a suspect's cooperation and contemporaneous consent. Even if the threat of criminal penalties were needed to gain cooperation (and we have been presented with no evidence this is so), the Fourth Amendment permits police to seek a warrant or rely on another warrant exception other than consent. A suspect has no right to avoid a search justified under the Fourth Amendment, and if 8-1025 was limited only to these situations, a police threat of procuring a warrant could provide a nearly identical threat of criminal penalties.

### 6.8. *Overall, is 8-1025 narrowly tailored?*

We do not find 8-1025 to be limited and narrowly tailored. It is impermissibly broad because it allows the State to criminally punish those who refuse a search that is *not* grounded in the Fourth Amendment. Because the State can achieve the same ends through constitutional means, the State's objective in cases like Ryce's can only be "to chill the assertion of constitutional rights by penalizing those who choose to exercise them." See also *Jackson*, 390 U.S. at 581 ("If the [law] had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional."). Investigative and prosecutorial efficiency alone is not an interest that can survive strict scrutiny.

In essence, the State's reasons are not good enough, and its law not precise enough, to encroach on the fundamental liberty interest in avoiding an unreasonable search. See *Robel*, 389 U.S. at 265-68. Accordingly, we conclude that 8-1025 is facially unconstitutional.

### CONCLUSION

Because we conclude that K.S.A. 2014 Supp. 8-1025 violates a suspect's Fourth and Fourteenth Amendment rights and, thus, § 15 of the Kansas Constitution Bill of Rights, we need not and do not reach whether it violates the Fifth Amendment prohibitions against compelled self-incrimination. See U.S. Const. amend. V; see, *e.g., South Dakota v. Neville*, 459 U.S. 553, 559, 562-64, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983); *Schmerber v. California*, 384 U.S. 757, 765, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966); *State v.*

*Brown,* 286 Kan. 170, 173, 182 P.3d 1205 (2008). We also do not reach Ryce's argument that *Miranda* warnings must be given along with a police officer's request for a chemical test. See *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *State v. Schultz,* 289 Kan. 334, 340, 212 P.3d 150 (2009). Nor do we decide whether K.S.A. 2014 Supp. 8-1025 is unconstitutional under the doctrine of unconstitutional conditions. See, *e.g., Dolan v. Tigard,* 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994); *State v. Mueller,* 271 Kan. 897, 27 P.3d 884 (2001).

Although the reasons for our decision differ from those of the district court, an appellate court can affirm the district court if the court was right for the wrong reason. *State v. May,* 293 Kan. 858, 870, 269 P.3d 1260 (2012). We, therefore, hold that K.S.A. 2014 Supp. 8-1025 is facially unconstitutional and affirm the district court's decision to dismiss the count against Ryce that criminalizes his refusal to submit to the test.

Affirmed.

\* \* \*

STEGALL, J., dissenting: At root, this appeal asks the question: What conduct is actually prohibited by K.S.A. 2014 Supp. 8-1025? If that conduct is, in all circumstances and at all times, constitutionally protected, it cannot be criminally sanctioned by the State and the statute is facially unconstitutional. But if, in some circumstances, the prohibited conduct is *not* constitutionally protected, then the constitutionality of the statute can only be determined on a case-by-case, as applied, basis. Because Ryce asserts a facial challenge to K.S.A. 2014 Supp. 8-1025, he must demonstrate that the prohibited conduct is *always* constitutionally protected in order to prevail. Stated another way, if the State can demonstrate that the statute *could* be applied to prohibit conduct that is not constitutionally protected, then we cannot declare the statute to be facially unconstitutional.

Given this, the outcome of Ryce's appeal hinges entirely on our interpretation of K.S.A. 2014 Supp. 8-1025. And our interpretation of K.S.A. 2014 Supp. 8-1025 turns on which interpretive rules we follow while assessing the statute's meaning. The majority properly

recites those interpretive rules only to promptly skirt them. Slip op. at 10. First, we are guided by our ordinary method of statutory interpretation, beginning with the plain language of the statute, giving common words their ordinary meaning. *State v. Urban*, 291 Kan. 214, 216, 239 P.3d 837 (2010). But, when the constitutionality of a statute turns on the interpretive meaning we choose to give to that statute, we must apply a second interpretive lens which instructs us, if possible, to choose a "'plausible interpretation[] of a statutory text'" that avoids unconstitutionality over other interpretations that render the statute constitutionally infirm. *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 368, 361 P.3d 504 (2015) (quoting *Clark v. Martinez*, 543 U.S. 371, 381, 125 S. Ct. 716, 160 L. Ed. 2d 734 [2005]).

We recently described this rule of constitutional avoidance as the court's "duty to construe a statute as constitutionally valid when it is faced with more than one reasonable interpretation." *Hoesli*, 303 Kan. at 367. This duty does not arise, however, when there is "only one reasonable meaning [that] can be gleaned from the statutory text." 303 Kan. at 367. "[I]t is 'our mandate to construe statutes in a fashion to avoid a constitutional infirmity where possible.' [Citation omitted.] But, we cannot use the doctrine of constitutional avoidance to change the meaning of unambiguous statutory language." *State v. Thompson*, 836 N.W.2d 470, 484 (Iowa 2013) (quoted in *Hoesli*, 303 Kan. at 368).

This is consistent with our earlier formulation of the avoidance doctrine. In *State v. Durrant*, 244 Kan. 522, 534, 769 P.2d 1174 (1989), we stated:

"This court not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute. To accomplish this purpose the court may read the necessary judicial requirements into the statute."

In *State v. Marsh*, 278 Kan. 520, 539, 102 P.3d 445 (2004), *overruled on other grounds* 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), we reaffirmed the rule that the avoidance doctrine is appropriate where statutory language is ambiguous or vague, but inappropriate "if its application would result in rewriting an unambiguous statute." Statutory ambiguity has been described in a

myriad of ways, but fundamentally, a "statute is ambiguous when two or more interpretations can fairly be made." *Petty v. City of El Dorado*, 270 Kan. 847, 851, 19 P.3d 167 (2001). That is to say, "'the statute must be genuinely susceptible to two constructions after, and not before, its complexities are unraveled. Only then is the statutory construction that avoids the constitutional question a "fair" one.'" *Marsh*, 278 Kan. at 538 (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 238, 118 S. Ct. 1219, 140 L. Ed. 2d 350 [1998]).

In sum, the rule of constitutional avoidance states that if a court can *genuinely, reasonably, plausibly,* or *fairly* interpret and construe statutory language *consistent with legislative intent* in a manner that also preserves it from impermissibly encroaching on constitutional limits, the court must do so. At the same time, the rule does not extend so far as to permit a court to impose an *unreasonable, implausible,* or *unfair* interpretation on statutory language that either changes the meaning of unambiguous language or runs directly counter to clear legislative intent.

Both sides of this calculus—which are fully encompassed in the judicial decision to either apply the rule or not to apply the rule— are rooted in the practice of judicial restraint when exercising the power of judicial review. And judicial restraint is itself rooted in the principles of separation of powers—it is both a doctrinal and a pragmatic judicial acknowledgement of the constitutional bedrock that the legislative branch, not the judicial branch, makes the law. The "'basic democratic function'" of the avoidance doctrine is to maintain "'a set of statutes that reflect, rather than distort, the policy choices that elected representatives have made.'" *Marsh*, 278 Kan. at 538 (quoting *Almendarez-Torres*, 523 U.S. at 238). However, "'if a court reads an ambiguity into an unambiguous statute simply for the purpose of avoiding an adverse decision as to the constitutionality of that statute, the court would be exercising legislative powers and thereby usurping those powers.'" *Marsh*, 278 Kan. at 542 (quoting *Padilla ex rel. Newman v. Bush*, 233 F. Supp. 2d 564, 597 [S.D.N.Y. 2002]); see also *Solomon v. State*, 303 Kan. 512, 534-47, 364 P.3d 536 (2015) (Stegall, J., concurring) (delineating proper from improper exercise of judicial restraint).

Today's majority loses its way early in its analysis of the statutory language by asking the wrong question—*i.e.*, "is implied consent irrevocable?" 303 Kan. at 902, 931. This is not surprising given that at first blush, consent appears to be the lodestar of the statutory scheme. But by making this case about a person's right to consent or not to consent to a search, the analysis quickly and necessarily bogs down in a lengthy consideration of the principles of consent—implied and otherwise. But these principles are *not* fundamentally constitutional in nature—which is to say, the existence of consent only enters the analysis if the state does not have an otherwise constitutional Fourth Amendment right to perform a search.

By making this case about consent, the majority effectively looks at this appeal through the wrong end of the telescope and ends up with a myopic interpretation of K.S.A. 2014 Supp. 8-1025. If it were merely a question of whether the majority's interpretation of the statute (criminalizing the revocation of implied consent) is reasonable, I would have no quarrel. But this is a due process challenge arising out of rights protected by the Fourth Amendment. Our analysis must therefore contend principally with the rights protected by the Fourth Amendment—*viz.*, the right to be free from unreasonable searches and seizures. The proper question to ask in this appeal is whether K.S.A. 2014 Supp. 8-1025 always results in an interference with this Fourth Amendment right. This framing would allow the court to vindicate the principle of constitutional avoidance by considering whether there is a reasonable, plausible, or fair competing interpretation of K.S.A. 2014 Supp. 8-1025 that does not, *or may not in all circumstances*, violate a person's due process right to insist that he or she not be searched in violation of the Fourth Amendment. And, in fact, there is genuinely such an alternative interpretation.

Beginning at the wrong place, today's majority ends up concluding that K.S.A. 2014 Supp. 8-1025 makes it "a crime to withdraw the implied consent that arises under K.S.A. 2014 Supp. 8-1001 by expressly refusing the test." 303 Kan. 899, Syl. ¶ 5. In so doing, the majority dramatically narrows and limits the applicability of the actual elements of the crime set forth in the statute and rejects out of hand any broader consideration of whether the statutory language

actually makes it a crime to "refus[e] to submit to a test authorized under a warrant exception other than consent." 303 Kan. 899, Syl. ¶ 5. The majority likewise rejects the third possibility that the statute makes it a crime to refuse to submit to certain tests "conducted pursuant to a warrant." 303 Kan. at 918. Under either of these latter two interpretive possibilities, there is no constitutional right to refuse the test. There is, in fact, no legally operative "consent" that might be "revoked." This is because of the well-settled principle that a person has no right to refuse consent to a search that is authorized by the Fourth Amendment—either because it is a search pursuant to a warrant or it is a search pursuant to a warrant exception other than consent. See, *e.g.*, *South Dakota v. Neville*, 459 U.S. 553, 560 n.10, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983) (no right to refuse a constitutionally valid blood-alcohol test under *Schmerber* exigency standard); *Burnett v. Municipality of Anchorage*, 806 F.2d 1447, 1450 (9th Cir. 1986) ("Consent in the constitutional sense is only required where the defendant has a legal right to refuse."); *United States v. Habig*, 474 F.2d 57, 61 (7th Cir.) (Corporate officer has no constitutional right to refuse production of corporate records in response to a lawful request.), *cert. denied* 411 U.S. 972 (1973); *State v. Bernard*, 859 N.W.2d 762, 773 (Minn.), *cert. granted* 136 S. Ct. 615 (2015) (A defendant "does not have a fundamental right to refuse a constitutional search."); *State v. Turner*, 263 Neb. 896, 899, 644 N.W.2d 147 (2002) (When a search is constitutionally valid "a suspect's right to refuse a chemical test is a matter governed purely by statute."); see also, *e.g.*, *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search."); *State v. Bennett*, 288 Kan. 86, 92, 200 P.3d 455 (2009) ("the Fourth Amendment does not protect against all searches and seizures, but only those that are unreasonable"); *State v. Seabury*, 267 Kan. 431, 438, 985 P.2d 1162 (1999) (obstructing the execution of a search warrant supported a misdemeanor obstruction charge).

Therefore, if the statute is interpreted broadly enough to encompass either of the two latter factual scenarios, it can be saved from encroaching on any constitutionally protected right—at least

in the circumstances described by those scenarios. The only remaining question is whether such an interpretation of K.S.A. 2014 Supp. 8-1025 is genuinely reasonable, plausible, or fair. In my view, it is.

K.S.A. 2014 Supp. 8-1025, by its own terms, makes it a crime for certain persons to "refus[e] to submit to or complete a test or tests deemed consented to under subsection (a) of K.S.A. 8-1001." Notably, the plain language of the statute criminalizes the physical act of refusing to submit to a test, not, as the majority would have it, the claiming of a specific legal status—*i.e.*, "withdrawing consent to search." The other element of the crime, in addition to refusal, is simply a definition of the kind of test which it is a crime to refuse. "Tests deemed consented to" is a broad term and applies to "all quantitative and qualitative tests for alcohol and drugs" of a person "who operates or attempts to operate a vehicle within this state." K.S.A. 2014 Supp. 8-1001(a). That is the extent of the statute's own terms. A literal rendition of the statute that reads the referenced provisions of K.S.A. 2014 Supp. 8-1001(a) directly into the elements of the crime looks like this: K.S.A. 2014 Supp. 8-1025 makes it a crime for a person with certain clearly defined prior convictions, who has operated or attempted to operate a vehicle in the state of Kansas, to refuse to submit to or complete any quantitative or qualitative test for alcohol or drugs. Nowhere in the statute's plain language is there any reference to withdrawing or revoking consent, or otherwise asserting any legal right. The majority simply adds this gloss onto the language because it has analytically painted itself into the corner of "consent."

K.S.A. 2014 Supp. 8-1001(a) indicates that the tests at issue in K.S.A. 2014 Supp. 8-1025 are "subject to the provisions" of Chapter 8, Article 10 of the Kansas Statutes. As the majority points out, Article 10 "limit[s] the circumstances under which '[a] law enforcement officer shall request a person to submit to a test or tests deemed consented to under subsection (a).' K.S.A. 2014 Supp. 8-1001(b)." 303 Kan. at 907. Importantly, while Article 10 restricts the circumstances in which a law enforcement officer may administer a test, it is far from clear that Article 10 does anything to limit the class of tests "deemed consented to under subsection (a)." K.S.A. 2014 Supp. 8-1001(b).

Regardless, rather than confirming the majority's characterization of K.S.A. 2014 Supp. 8-1025 as criminalizing the revocation of consent, a quick perusal of the many different conditions imposed on law enforcement by the remainder of Chapter 8, Article 10 actually demonstrates that such tests were contemplated by the legislature in circumstances in which consent is irrelevant. For example, K.S.A. 2014 Supp. 8-1001(p) contemplates that in some circumstances, the tests deemed consented to will actually be administered pursuant to either a search warrant or a search incident to arrest. Thus, if a law enforcement officer obtained the warrant expressly contemplated by K.S.A. 2014 Supp. 8-1001(p), and requested "such test or tests" pursuant to that warrant, a person would have no legal right to refuse to submit to that test. Assuming the validity of the warrant, such a hypothetical person could be convicted of refusing to submit to that test—a test expressly "deemed consented to"—without any due process violation of that person's Fourth Amendment rights. That person's consent, implied or actual, revoked or not, would be entirely beside the point.

Likewise, exigency continues to be a possible source of legal authority, on a case-by-case basis, for a search via a "test deemed consented to." See *Missouri v. McNeely*, 569 U.S. ___, 133 S. Ct. 1552, 1558, 185 L. Ed. 2d 696 (2013). In part, this is because, as a matter of law, tests that are statutorily "deemed consented to" may in actual fact not be consented to—or the deemed consent may be constitutionally infirm. See, *e.g.*, *State v. Declerck*, 49 Kan. App. 2d 908, 909-10, 922, 317 P.3d 794, *rev. denied* 299 Kan. 1271 (2014); *State v. Dawes*, No. 111,310, 2015 WL 5036690, at *4 (Kan. App. 2015) (unpublished opinion). But this does not mean that the tests are somehow no longer in the statutory category of tests "deemed consented to." They plainly are. The majority dismisses this common sense, plain reading approach as "oxymoronic," reasoning that when a "person has expressly refused consent . . . it would be incongruous . . . to say the person was deemed to have consented to the test." 303 Kan. at 918. Here the majority mistakenly concludes that a determination of whether a certain test belongs in the statutory class of tests "deemed consented to" is contingent upon, not the test, but the person's response to a lawful request to submit to

the test. According to the majority, simply by refusing to submit to a test, a person can render the test requested one that no longer belongs in the statutory category of a test deemed consented to. The internal inconsistencies are clear. This is no way to conduct statutory analysis.

In my view, the determination of whether any requested test fits the statutory class of tests "deemed consented to" should be made by looking at the statutory scheme, not by looking to the legal or practical effectiveness of that statutorily "deemed" consent. And there is nothing to prevent the State from lawfully seeking to administer a "test deemed consented to"—even in circumstances where that statutory declaration is legally or factually ineffective—other than the Fourth Amendment. If the Fourth Amendment has otherwise been complied with, the test may proceed, and a refusal to submit is, in fact, a refusal to submit to a test deemed consented to.

This is not only a *possible* reasonable, plausible, and fair interpretation of the statutory language, it is the *most* reasonable, plausible, and fair interpretation—especially in light of the plain language of the statute. To illustrate the point one final time: The question must be asked, is it possible for a "test deemed consented to" to be lawful without consent? The answer is, of course, yes. The physical act of refusing to submit to such a test can be criminalized by the State without running afoul of the defendant's due process rights. Because there are numerous scenarios in which a reasonable application of the actual language and elements contained in K.S.A. 2014 Supp. 8-1025 would not be unconstitutional, the statute should survive any facial challenge. By rejecting that reasonable application of the actual language and elements of the statute in order to strike it down as facially unconstitutional, the majority has neglected our interpretive duty to avoid a finding of unconstitutionality when a reasonable, plausible, and fair alternative is genuinely available.

Because it is reasonable to conclude that the statute prohibits conduct, in some circumstances, that is *not* constitutionally protected, the constitutionality of the statute can only be determined on a case-by-case, as applied, basis and we should not declare the

statute to be facially unconstitutional. In so doing, today's decision has undermined the "basic democratic function" of our avoidance doctrine which functions to maintain, insofar as is possible, "the policy choices that elected representatives have made." *Almendarez-Torres*, 523 U.S. at 238.